843 A.2d 1203

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Gerald WATKINS, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 9, 2002.

Decided June 6, 2003.

Reargument Denied March 23, 2004.

John L. Elash, for Gerard Watkins.

Michael Wayne Streily, Rebecca Denean Spangler, Sally Katherine Kaye, Pittsburgh, Robert A. Graci, Harrisburg, for Commonwealth of Pennsylvania.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## *OPINION*

Justice SAYLOR.

This is a direct appeal from a judgment of sentence imposed on December 13, 1996, by the Allegheny County Court of Common Pleas.

In December of 1994, Appellant was charged by information with three counts of criminal homicide for the shooting deaths of his ex-girlfriend and her two minor children in Pittsburgh.[1] On August 3, 1995, Appellant was arrested in New York City and returned to Pennsylvania. Pursuant to Rule of Criminal Procedure 352, the Commonwealth filed a notice of intent to seek the death penalty, and Appellant filed a motion to bar its imposition, as well as an omnibus pre-trial motion in which he sought, *inter alia,* suppression of certain statements he made to Pittsburgh detectives while en route from New York to Allegheny County. The trial court denied the omnibus motion after a hearing on December 9, 1996, deferring until completion of the guilt phase any ruling on the death penalty motion. Trial was held on December 9–12, 1996, after which the jury found Appellant guilty of three counts of first-degree murder. The following day, the same jury determined that the aggravating circumstances outweighed any mitigating factors, and set the penalty at death for each homicide.[2] The court denied

1. *See* 18 Pa.C.S. § 2501(a).

2. The jury found two aggravating circumstances relative to all three victims, namely that Appellant had been convicted of another offense for which a sentence of life imprisonment or death was imposable, *see* 42 Pa.C.S. § 9711(d)(10), and that Appellant had been convicted of another murder, *see* 42 Pa.C.S. § 9711(d)(11), and an additional aggravating circumstance—that the victim was less than twelve years of age, *see* 42 Pa.C.S. § 9711(d)(16)—with regard to two of the victims. The jury found the "catchall" mitigating circumstance as to all three mur-

Appellant's prior motion to bar imposition of the death penalty, and formally imposed three consecutive sentences of death.

On December 26, 1996, penalty phase counsel filed post-sentence motions, alleging that the death penalty statute was unconstitutional and challenging the trial court's instructions during the penalty phase. Thereafter, on December 30, 1996, the court appointed John Elash, Esq. (present counsel) to represent Appellant for purposes of filing a petition pursuant to the Capital Unitary Review Act ("CURA"), 42 Pa.C.S. §§ 9570–9579. The trial court denied the post-sentence motions by order dated April 24, 1997, and no appeal from such denial was taken. Subsequently, on May 2, 1997, Attorney Elash filed a CURA petition alleging trial counsel's ineffectiveness in preparing for trial, and challenging the constitutionality of CURA. An amended CURA petition was filed August 4, 1997. This Court suspended CURA one week later, *see In re Suspension of the Capital Unitary Review Act,* No. 224 Criminal Procedural Rules Docket No. 2 (filed August 11, 1997), *reh'g denied,* 554 Pa. 625, 722 A.2d 676 (Pa.1999), effectively rendering Appellant's CURA petition moot and ending Attorney Elash's representation.

For reasons that do not appear in the record, no notice of appeal was filed on behalf of Appellant nor was the record transmitted to this Court. The matter thus remained dormant for several years until the trial court discovered that no decision was pending in the case. The court then issued an order, dated February 28, 2001, *inter alia,* reciting that Appellant's CURA petition had been dismissed by operation of law upon CURA's suspension, withdrawing all prior counsel, and re-appointing Attorney Elash to represent Appellant in his appeal to this Court. The trial court additionally prepared an opinion addressing the issues raised in Appellant's pre-trial motion, in his death penalty motion, during trial, in his post-sentence motions, and in his CURA petition. The case was then certified for immediate appeal to this Court.

ders. *See* 42 Pa.C.S. § 9711(e)(8) (relating to "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense").

At approximately 10:00 p.m. on July 20, 1994, Beth Ann Anderson telephoned her friend and neighbor, Monique Kohlman, and told her that "Gerald [is] downstairs banging on the door." Anderson, who was using a portable phone, asked Kohlman to stay on the line as she went to the door. Kohlman then heard Anderson say, "Who is it?" and then, "Gerald." A few seconds later an individual whose voice and accent Kohlman recognized as belonging to Appellant, picked up the phone and spoke with Kohlman. He identified himself as 'G', which Kohlman recognized as Appellant's nickname. The phone was then placed down, and Kohlman heard Anderson say "ow" or "stop Gerald." She then heard the sounds of a struggle, and then Anderson saying, "Call the police." After summoning the police, Kohlman went to Anderson's home, and, as she pounded on the front door, the police arrived and forced entry. Kohlman entered the house and observed Anderson on the floor and Anderson's 18–day–old baby, Melanie Watkins, lying on the couch. She tried unsuccessfully to detect pulses on both victims. The police then asked her to wait outside on the front porch.

Another neighbor, Ronnie Williams, saw Appellant on the porch of the Anderson home during the evening of July 20, 1994. He said that he recognized Appellant as Anderson's boyfriend, and that he saw him knocking on the front door to her home. He did not see him enter, because he went to answer the phone. When he returned to the front door several minutes later, the police had already arrived. The following day, Williams picked Appellant's photo from a photo array as the individual he saw. He also identified Appellant at trial as the person he had seen.

Pittsburgh Police Officer Talib Ghafoor responded to the call from Kohlman. Officer Ghafoor arrived as Kohlman was trying to enter the residence. Upon entering, he observed Anderson on the floor and the baby on the couch. Anderson had wounds to her face and the baby had what appeared to be a gunshot wound to the abdomen. When the officer proceeded upstairs to secure the residence, he discovered the body of nine-year-old Charles Kevin Kelly, Jr. ("Kevin") in the hallway

at the top of the stairs. Officer Ghafoor observed that Kevin had a bullet wound near his right ear and was not moving or breathing.

Pittsburgh Homicide Detective Thomas Foley processed the crime scene. He testified that in the living room, where the bodies of Anderson and her daughter were found, a coffee table had been upturned and its contents spilled on the floor. Numerous spent .22 caliber shell casings, as well as several live rounds, were found throughout the room. Shell casings and spent bullets were also strewn about Kevin's body. All three victims were warm to the touch, indicating recent death. Forensic pathologist Leon Rozin, M.D., testified that the victims all died of multiple gunshot wounds: eighteen-day-old Melanie Watkins had been shot twelve times; Beth Ann Anderson received eight shots to her trunk and head; and her son Kevin was shot five times in the face, head, and neck. There was soot or powder stripling around many of the wounds, indicating that the bullets had been fired at close range. The Commonwealth's ballistics expert, Dr. Robert Levine of the Allegheny County Crime Lab, testified that all of the spent cartridge casings found at the crime scene were discharged from the same semi-automatic .22 caliber firearm, which was capable of holding a thirty-round clip. He additionally indicated that the markings on the bullets found at the scene were consistent with having been fired from a "Tech .22" semi-automatic handgun.

Appellant's friend Keith Platt testified that he had been with Appellant at a bar until approximately 9:30 p.m. on the night of the murders. One or two days after the crime, Appellant called Platt and said: "You know who this is. I'm not f---ing around. You know what I've done. Shut up and listen." Appellant then told Platt that he needed Platt to contact several mutual acquaintances who owed Appellant money, and instruct them to send the money to Appellant. When Platt declined, Appellant threatened to harm Platt and his family if he did not cooperate. Platt also testified that he knew Appellant only as 'G,' and did not learn that his actual name was Gerald until after the murders.

In May of 1995, FBI Special Agent Robert Bendetson and other members of the New York Fugitive Task Force apprehended Appellant in New York City, and informed him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). After waiving those rights orally and by executing a form to that effect, Appellant gave the agent a statement. He said that, on the evening in question, he left Pittsburgh at approximately 7:00 in his grandmother's car. He admitted having been at Anderson's house earlier that day, but denied having argued with her. He said that he drove to Fort Lee, New Jersey, left the car there, and took a bus into New York City. Although Appellant admitted knowing that he was wanted for Anderson's murder, he claimed not to have been aware of the deaths of his daughter Melanie or Anderson's son Kevin. He also admitted having seen an episode of the television show, "America's Most Wanted," which featured a story about him, but claimed that he had not paid close enough attention to learn of the death of his daughter, Melanie. He admitted further that he never inquired into Melanie's well being after learning of Anderson's death.

On August, 3, 1995, Pittsburgh homicide Detectives Logan and McDonald drove to New York to bring Appellant back for trial. After an extradition hearing at which Appellant was represented by New York counsel, Attorney Earl Rawlins, Appellant and the two officers left for Pittsburgh. Detective Logan testified that, during the initial part of the drive, Appellant was talkative, but confined the discussion to matters unrelated to the homicides. As they approached Somerset, Pennsylvania, however, Appellant raised the topic of the killings. Detective Logan interrupted Appellant and advised him of his rights. Appellant said that he understood his rights and agreed to make a statement, which Detective Logan transcribed, and Appellant ultimately signed.

At the December 9, 1996, suppression hearing, Appellant denied having spoken to Detective Logan or Detective McDonald about the killings during the trip from New York to Pittsburgh, and testified that he had not signed Detective

Logan's notes which purported to memorialize his confession. The court denied the suppression request, reasoning that Appellant was raising an issue of credibility for the jury, rather than a question of whether the alleged confession violated his constitutional rights.

According to Detective Logan's trial testimony, Appellant began his statement by saying that "he was not the monster that the media and the police had panned him out to be." He claimed that the killings were not premeditated, that they were just "something that happened." He indicated that he had become jealous of a man named Lou with whom Anderson had begun spending time, and that he believed that Anderson was not being forthright with him regarding her relationship with Lou. A day or so before the murders, Anderson had spurned a marriage proposal. Appellant was also upset that his cousin Tyrone had stolen crack cocaine from him instead of bringing it from New York to Pittsburgh as instructed, and that, when he told Anderson about it, she made him feel like a "chump." On July 19, 1994, still upset from this series of events, Appellant borrowed his grandmother's car and drove towards Harrisburg on the turnpike, but then returned to Pittsburgh, arriving the morning of the 20th. He had in his possession a Tech .22 semi-automatic handgun equipped with a twenty-round clip. After driving around Pittsburgh and searching unsuccessfully for Tyrone, he visited his cousin Willa in an effort to calm down. Appellant then drove to Anderson's house, gained entry with his key, and found Anderson talking on the phone, whereupon he walked into the kitchen, and then came back into the room where she was talking and shot her. Appellant denied having picked up the phone and spoken to anyone.

After killing Anderson, Appellant heard the television on upstairs. When Appellant reached the top of the steps, Anderson's son Kevin, who had come into the upstairs hallway, made eye contact with Appellant and then grabbed Appellant around the waist. At that point, Appellant decided to kill Kevin "because he knew who I was and what I had just done." He then pushed Kevin away and shot him. Appellant checked

the rest of the second floor of the house and, finding nobody else, proceeded back downstairs, where Anderson's body was on the floor and Appellant's daughter Melanie was asleep on the couch. He then shot Melanie because he felt that he could not raise her, and he did not want anyone else to do so. Appellant tucked the gun in his waistband and left Anderson's residence, trying to look "normal." He could not recall how many times he had shot any of the victims. As he stopped to put gas in the car, he noticed that his ammunition clip was empty. He then drove to New York, where he threw the gun into the incinerator of an apartment building.

When Appellant and the detectives arrived at the headquarters of the Homicide Unit in Pittsburgh, Appellant was again advised of his rights; he then read and executed a pre-interrogation warning form in the presence of Detectives Logan and McDonald, which contained *Miranda* warnings. Detective Logan reviewed his notes of Appellant's statement with Appellant, and asked Appellant to sign each page if it accurately reflected what he had told the detective. Appellant signed the notes; after speaking with his mother by telephone, he declined to repeat his statement or have it tape-recorded.

Detective McDonald—who had been driving as Detective Logan transcribed Appellant's statement—corroborated Detective Logan's account of Appellant's statement. He also indicated that he independently reviewed Detective Logan's notes to ensure their accuracy. A Pennsylvania State Police handwriting expert testified that the signatures on the pre-interrogation form and on Detective Logan's notes matched sample signatures provided by Appellant.

Appellant presented two character witnesses who testified to his reputation for peacefulness. He also testified in his own behalf and denied involvement in the crime. He maintained that on the day of the killings he had left Pittsburgh in his grandmother's car at 7:00 p.m., and that he was on the Pennsylvania Turnpike en route to New York when the killings occurred later that evening. He asserted that the statement produced by Detective Logan was fabricated, and that

the signatures on the notes and the pre-interrogation form were forged. He also claimed that Special Agent Bendetson had lied about the content of their discussion, and that Monique Kohlman had lied about having heard his voice on the phone. Additionally, he averred that his friend Keith Platt had lied about the threatening phone call that Platt allegedly received from Appellant. During cross-examination, Appellant admitted having been involved in drug trafficking, and claimed that, upon learning of the murders, he decided to stay in New York and conduct "illegal businesses" to pay for an attorney in the event that he was subsequently arrested.

Although Appellant does not challenge the sufficiency of the evidence supporting his first-degree murder convictions, this Court undertakes such review in all cases in which the death penalty is imposed. *See Commonwealth v. Ockenhouse,* 562 Pa. 481, 489, 756 A.2d 1130, 1134 (2000). The applicable standard is whether the evidence, viewed in the light most favorable to the Commonwealth, is sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt. *See Commonwealth v. Crews,* 436 Pa. 346, 348, 260 A.2d 771, 771–72 (1970). In applying this standard, we bear in mind that: the Commonwealth may sustain its burden by means of wholly circumstantial evidence; the entire trial record should be evaluated and all evidence received considered, whether or not the trial court's rulings thereon were correct; and the trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence. *See Commonwealth v. Harper,* 485 Pa. 572, 576–77, 403 A.2d 536, 538–39 (1979).

To obtain a conviction for first-degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed; that the defendant did the killing; and that the killing was done in an intentional, deliberate, and premeditated manner, *see* 18 Pa.C.S. §§ 2501, 2502(a); *Commonwealth v. Williams,* 537 Pa. 1, 13, 640 A.2d 1251, 1256–57 (1994), which this Court has construed to mean that the

defendant acted with a specific intent to kill. *See Commonwealth v. Keaton,* 556 Pa. 442, 455, 729 A.2d 529, 536 (1999) (citing *Commonwealth v. Harvey,* 514 Pa. 531, 537, 526 A.2d 330, 333 (1987)). A specific intent to kill may be inferred from the use of a deadly weapon on a vital part of the victim's body. *See Commonwealth v. Marshall,* 534 Pa. 488, 500, 633 A.2d 1100, 1106 (1994).

■ Upon review of the record, we are satisfied that the Commonwealth presented sufficient evidence to support a guilty verdict as to all three victims. In view of the uncontested evidence that all three victims died of multiple gunshot wounds to vital areas of the body, and that the bullets were all fired from the same gun, the only question in dispute was the identity of the killer. In this regard, the Commonwealth presented multiple witnesses whose testimony tended to prove that Appellant was the perpetrator, including two police officers who recounted Appellant's detailed confession. Additionally, the Commonwealth's handwriting expert concluded that the signature on the confession matched Appellant's sample signatures. It was also established that Appellant fled the jurisdiction and concealed himself from the police for ten months following the incident. In light of these proofs, the jury was justified in concluding that Appellant was the person who killed the victims. Accordingly, we now turn to Appellant's claims of error.

Appellant first contends that the trial court erred in denying his motion to suppress the confession he provided to Detective Logan. He argues that, at the suppression hearing, Attorney Rawlins claimed to have instructed Detectives Logan and McDonald not to speak with Appellant about the crimes, and that the Commonwealth could not satisfy its burden to show that Appellant's waiver of his rights was knowing, intelligent, and voluntary. Appellant additionally avers that, by characterizing the issue as one of credibility, the suppression court erroneously afforded "less protection" to his claim denying that the statement was made than it would have given to a claim of coercion. The Commonwealth responds that the suppression court correctly determined the issue to be one of

credibility, as Appellant maintained that he did not make any statement, and the detectives asserted that he did. Furthermore, the Commonwealth claims that the statement was not coerced in any event, as Appellant initiated the discussion of the killings and continued to provide his statement after validly waiving his rights.

As previously noted, the trial court denied suppression on the basis that Appellant had not raised any challenge to the voluntariness of his confession.[3] In its opinion, the trial court echoed its prior reasoning and further indicated that, assuming Appellant had confessed, no constitutional violation resulted because Appellant had initiated the discussion with the detectives and had validly waived his *Miranda* rights.

■■ In reviewing a ruling denying a motion to suppress, this Court considers only the evidence of the prosecution's witnesses and so much of the defense evidence as remains uncontradicted. *See Commonwealth v. Crosby,* 464 Pa. 337, 342, 346 A.2d 768, 771 (1975) (citing *Culombe v. Connecticut,* 367 U.S. 568, 604, 81 S.Ct. 1860, 1880, 6 L.Ed.2d 1037 (1961)). The present situation is unusual in that Appellant's position throughout the proceedings in the trial court was not that his confession was coerced, but that he never made or signed it. Appellant cites no authority, however, for the proposition that the suppression court was required to dispose of his claim of police fabrication via the ordinary inquiry into the quality of his waiver. To the contrary, since the police maintained that Appellant confessed and signed the statement, and Appellant claimed that he did not confess or sign the statement, the suppression court correctly determined that the issue raised was one of credibility, not voluntariness.[4] *Accord People v. Washington,* 51 N.Y.2d 214, 433 N.Y.S.2d 745, 413 N.E.2d

---

**3.** In his omnibus pre-trial motion, Appellant moved to suppress the confession upon substantially the same basis, namely, that he had never made it.

**4.** We distinguish this matter from a case in which the defendant claims that the police fabricated the confession and then coerced him to sign it. While such a claim also concerns police fabrication, the issue raised is one of voluntariness. *See, e.g., Commonwealth v. Crenshaw,* 504 Pa. 33, 38, 470 A.2d 451, 453 (1983).

1159, 1162 (1980); *cf. Commonwealth v. Baker*, 531 Pa. 541, 548, 614 A.2d 663, 666 (1992) (upholding denial of suppression where defendant claimed that he was confused when he gave his statement and that his confession had internal conflicts, reasoning that such matters were credibility issues for the jury, to be explored through cross examination). Accordingly, as there was competent proof that Appellant did in fact make the statement at issue, the trial court was not required to suppress it based solely upon Appellant's claim that he never made or signed it. *Accord Cobb v. State*, 734 So.2d 182, 184–85 (Miss.App.1999) (holding that exclusion is not required where a defendant's claim that he never made the challenged statement is contradicted by competent evidence).

Appellant also suggests that the lengthy drive from New York to Pittsburgh, as well as Appellant's demeanor during the trip, indicate that, even if the confession was made, it was involuntary. This claim is waived, as Appellant did not raise it in his omnibus motion, at the suppression hearing, or in his post-sentence motions. *See* Pa.R.A.P. 302(a). Still, under the relaxed waiver doctrine applicable in capital direct appeals, we will reach the merits of the issue. *See Commonwealth v. Rizzuto*, 566 Pa. 40, 61, 777 A.2d 1069, 1081 (2001); *Commonwealth v. DeJesus*, 567 Pa. 415, 439 n. 16, 787 A.2d 394, 408 n. 16 (2001).[5]

Inculpatory statements stemming from a custodial interrogation may not be used unless the defendant was apprised of his right against self-incrimination and his right to counsel. *See DeJesus*, 567 Pa. at 428, 787 A.2d at 401. Thereafter, the defendant may waive his rights, so long as the waiver is the result of a free and deliberate choice rather than intimidation, coercion, or deception, and the choice is " 'made with a full awareness both of the nature of the right being

---

5. Although relaxed waiver in this situation has been modified by *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385, 2003 WL 21255941 at *10 (May 30, 2003), that change does not apply to cases, such as this one, in which the appellant's brief was already filed in this Court at the time the decision in *Freeman* was announced. *See id.* at 562, 827 A.2d at 403, 2003 WL 21255941 at *11.

abandoned and the consequences of the decision to abandon it.' " *Id.* at 430, 787 A.2d at 402 (quoting *Colorado v. Spring,* 479 U.S. 564, 572, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987)). Detective Logan testified at the suppression hearing that, during the drive to Allegheny County, Appellant: initiated the discussion about the crime; promptly received *Miranda* warnings and manifested an understanding of them; and chose to continue his statement without his attorney present.[6] He also indicated that Appellant's demeanor was "talkative" and "carefree," and that no attempt was made to coerce or deceive Appellant into confessing. Appellant likewise confirmed that during the trip he was provided with sufficient food and was not subjected to coercive tactics. Under these circumstances, we find no error in the trial court's determination that the Commonwealth met its burden to establish that Appellant's waiver was valid. *See generally Commonwealth v. Hughes,* 521 Pa. 423, 442, 555 A.2d 1264, 1273 (Pa.1989) (voluntariness of confession judged according to the totality of the circumstances (citing *Commonwealth v. Kichline,* 468 Pa. 265, 279, 361 A.2d 282, 289–90 (1976))).

Alternatively, Appellant asserts that the suppression court erred in refusing to redact a portion of the confession relating to "prior bad acts" (namely, drug trafficking), which he contends were unconnected to the murders, and thus, not properly placed before the jury.[7] While this claim is presently included in Appellant's challenge to the suppression court's decision, it appeared in Appellant's omnibus pretrial motion as

---

6. Appellant's New York counsel, Attorney Rawlins, indicated that he had advised Detective McDonald not to speak with Appellant about the case during the trip to Pittsburgh. To the extent this may be construed as an expression of counsel's wish to be present with Appellant during any subsequent interrogation, *see Commonwealth v. Rigler,* 488 Pa. 441, 448, 412 A.2d 846, 850 (1980), this Court has clarified that a defendant's constitutional rights are his own and that, having received appropriate *Miranda* warnings, he may voluntarily waive those rights notwithstanding counsel's instructions to himself or the police. *See Commonwealth v. Lark,* 505 Pa. 126, 133, 477 A.2d 857, 861 (1984).

7. The confession was redacted in its entirety when Detective Logan's notes were provided to the jury for deliberation during the guilt phase of trial; only the signatures at the bottom of each page were left visible. Appellant does not challenge this aspect of the proceedings.

a motion in limine, not as part of his suppression request. Additionally, at the suppression hearing counsel confirmed his view that the appropriate forum for deciding the matters implicated by the limine motion would be "as they come up" during trial. N.T. 12/9/96 at 60. Since Appellant also raises a separate claim regarding several evidentiary rulings, discussion of this issue will be deferred until that claim is addressed.[8]

Next, Appellant contends that the trial court abused its discretion by failing to question a juror on the record about a collect call which someone in the Allegheny County Jail attempted to place to the juror's residence. Alternatively, Appellant argues that the court erred in allowing the juror to continue to serve on the jury after the call occurred. Appellant additionally avers that his trial counsel was ineffective for not requesting that the juror be excused for cause, or insisting that a record be made of the *voir dire*. The only information in the record concerning this incident appears in a statement made by the trial judge to the parties and counsel outside of the presence of the jury. *See* N.T. 12/10/96 at 277–78. In his statement, the judge indicated that one of the jurors had notified the tipstaff of the incident, and that, according to the juror, her mother answered the phone and refused to accept the call.[9] The judge also recited that he and defense counsel had questioned the juror, and that the court was satisfied that she "was unaffected" by the incident. Counsel did not object, interpose any contrary opinion, or request the juror's dismissal. Nor did counsel raise this issue in his post-sentence motions.

The question of whether the juror should have been dismissed was made apparent at trial, and was resolved with counsel's participation and consent. Therefore, any ob-

---

8. See *infra* note 10.

9. The judge also stated that Appellant was likely the only person at the jail with the jurors' names, and hence, the call was "a probable attempt at jury tampering." However, he suggested that there was insufficient evidence of Appellant's participation to reach any firm conclusion in that regard.

jection to the resolution of this issue is waived and, moreover, may not be reached via the relaxed waiver doctrine. *See Freeman*, 573 Pa. at 567, 827 A.2d at 406, 2003 WL 21255941 at *15 (relaxed waiver inapplicable where objection was raised at trial and agreement was reached as to its resolution); *cf. Commonwealth v. Gribble*, 550 Pa. 62, 79–80, 703 A.2d 426, 434–35 (1997) (suppression issue unreachable under relaxed waiver where defendant withdrew his suppression request prior to trial), *overruled on other grounds, Commonwealth v. Burke*, 566 Pa. 402, 413, 781 A.2d 1136, 1142 (2001). Thus, the proper focus of the inquiry is upon counsel's performance, including his reasons for being satisfied with the court's decision to allow the juror to continue to serve, and his decision not to request that the *voir dire* of the juror be recorded. In accordance with this Court's recent decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), such ineffectiveness claim will be deferred until collateral review, and should be raised, if at all, during that process. *See id.* at 67, 813 A.2d at 738 (applying new rule to all cases pending on direct appeal); *Freeman*, 573 Pa. at 544, 827 A.2d at 392, 2003 WL 21255941 at *1 (applying *Grant* to capital direct appeals).

Appellant's next claim is that the trial court erred in permitting multiple Commonwealth witnesses to refer to Appellant's alleged drug trafficking activities. Appellant argues that the court should have excluded all such references, as they portrayed him "as having a propensity to commit other criminal acts," which biased the jury against him. The challenged references were made by Keith Platt—who testified to the substance of a call Appellant made to him a day or two after the incident—and Detective Logan, who recounted a confession Appellant provided while traveling to Allegheny County.[10] In particular, after Platt described the threatening call he received from Appellant in which Appellant demanded money from their mutual acquaintances, defense counsel sought, on

10. Appellant characterizes this latter claim as a challenge to the denial of his suppression request. As noted, however, it is in substance a contention that evidence of uncharged bad acts was improperly admitted, rather than a claim that such evidence was illegally obtained. *See* text accompanying *supra* notes 7–8.

cross-examination, to undermine the plausibility of Appellant's having asked Platt to perform this service by eliciting testimony that Appellant had known such acquaintances longer than he had known Platt. Seeking to bolster the witness's credibility on re-direct, the prosecutor asked Platt why those individuals owed Appellant money. Platt responded, "Probably through drug dealings." Later, when Detective Logan was recounting Appellant's confession, he indicated that Appellant spoke of having traveled to New York to obtain "his drug supply," and stated that the events stemming from one such trip—namely, Appellant's cousin having stolen drugs from Appellant—contributed to his progressive anger leading up to the killings. Detective Logan explained that Appellant described these events in an effort to portray the killings as nonpremeditated, but just "something that happened." Appellant offers alternative theories to support his claim that all such drug testimony should have been excluded. He argues that: the trial court erred in allowing the testimony; counsel was ineffective for not "properly objecting" to it or seeking a cautionary instruction; and the trial court should have "redacted" the portions of Appellant's confession which involved Appellant's trips to New York to obtain drugs.

Evidence of a defendant's prior criminal activity may not be admitted solely to establish his bad character or criminal propensity. *See Commonwealth v. Paddy,* 569 Pa. 47, 68, 800 A.2d 294, 307 (2002). It may be admitted for various legitimate purposes, however, including to demonstrate motive or malice, *see Commonwealth v. LaCava,* 542 Pa. 160, 176, 666 A.2d 221, 229 (1995); *Commonwealth v. Lark,* 518 Pa. 290, 303, 543 A.2d 491, 497 (1988), so long as its probative value outweighs its prejudicial effect, *see Commonwealth v. Seiders,* 531 Pa. 592, 596, 614 A.2d 689, 691 (1992), and an appropriate cautionary instruction is given. *See Commonwealth v. Claypool,* 508 Pa. 198, 206, 495 A.2d 176, 179 (1985). Additionally, "evidence of other crimes may be admitted where such evidence is part of the history of the case and forms part of the natural development of the facts." *Commonwealth v. Collins,* 550 Pa. 46, 55, 703 A.2d 418, 423

(1997).[11] Ultimately, the decision whether to redact other-crimes evidence from a properly-admitted confession lies within the trial court's discretion informed by these principles. *See Commonwealth v. Bracey*, 541 Pa. 322, 337, 662 A.2d 1062, 1069 (1995).

As to Keith Platt's testimony, it is difficult to discern the basis for Appellant's claim of error. After Platt stated, "Probably through drug dealings," defense counsel objected, and the court issued an appropriate cautionary instruction.[12] Counsel did not object to the instruction or request a mistrial, and Platt made no further reference to Appellant's drug activities. Thus, the inclusion of Platt's passing reference to "probabl[e] . . . drug dealings" was not the result of any evidentiary ruling, and after it occurred Appellant received the curative measure he requested. The jury is assumed to have followed the cautionary instruction given. *See Commonwealth v. Baez*, 554 Pa. 66, 89–90, 720 A.2d 711, 722 (1998). Such instruction, moreover, is presumed to be sufficient to cure any prejudice, *see Commonwealth v. Dennis*, 552 Pa. 331, 345, 715 A.2d 404, 410 (1998), and Appellant offers no evidence to rebut this presumption. Accordingly, Appellant is not entitled to relief based upon Platt's testimony.

11. Some of these principles are now codified in the Pennsylvania Rules of Evidence, which were adopted in 1998. *See generally* Pa.R.Evid. 404.

12. The court instructed the jury:

> There was some reference made to drug dealers or drug trafficking. We are not going to go into that any further. All I can tell you is that Mr. Watkins, as you understand, is not on trial for any of those things, nor is there any accusation against him. I am going to ask you to disregard anything that has to do with drug dealers and drug trafficking at this point in the trial. If there is something that becomes relevant at another point in time, I will tell you how to consider it. For our purposes, that is not a matter which you should consider or allow yourselves to be prejudiced against any party or any witness.

> The court repeated this admonition in its jury charge, indicating that, "[i]f you find the defendant guilty, it must be because you are convinced by the evidence that he committed these crimes charged and not because you believe he is wicked or has committed other offenses or improper conduct."

Detective Logan was more specific, in that he related Appellant's admission that, during the time period leading up to the killings, Appellant "would go back and forth to New York to get his drug supply." Defense counsel objected, and argued at side bar that there was no reason to introduce any evidence of Appellant's activities in this regard, as such activities were irrelevant to whether Appellant had committed the murders. In response, the court stated that Appellant's confession to Detective Logan contained several references to different aspects of his drug trafficking, that such references were "indigenous" to the statement, and that they appeared to address Appellant's motive for committing the crime. Furthermore, the court reasoned that the disputed references to Appellant's drug activities were admissible upon the independent ground that they were contained in Appellant's own confession to the police. Accordingly, the court overruled the objection and issued a cautionary instruction, directing the jury to consider the evidence of drug trafficking as providing context for the rest of the statement, but not as constituting proof of bad character so as to infer guilt for the murders. In its opinion, the court reaffirmed its decision to admit Detective Logan's drug testimony, concluding that such testimony "was not offered to show that the defendant was a bad person," but instead

> to show the defendant's state of mind in the days or hours leading up to the murders. He was angry with himself for being ripped off by his cousin, and at Anderson for making him feel like a "chump." ... This evidence of other crimes was admissible to show the defendant's motive and state of mind.

Trial Court op. at 15–16.

The trial court's suggestion that Appellant's confession was admissible in its entirety finds support in several decisions of this Court.[13] *See, e.g., Commonwealth v. Hipple,* 333 Pa. 33, 40, 3 A.2d 353, 356 (1939) (" '[I]f a voluntary confession is

---

**13.** The trial court determined that Detective Logan's notes, signed by Appellant, constituted a written confession. Appellant does not challenge that assessment.

made to police officers, the whole is admissible in evidence, even though it may contain admissions of other offenses unrelated to the one for the commission of which the defendant is on trial.' " (quoting *Commonwealth v. Gable*, 323 Pa. 449, 452, 187 A. 393, 394 (1936), *overruled on other grounds, Commonwealth v. Mulgrew*, 475 Pa. 271, 275, 380 A.2d 349, 351 (1977))); *Commonwealth v. Weston*, 297 Pa. 382, 389, 147 A. 79, 82 (1929).

In several more recent decisions from other jurisdictions, courts have applied traditional evidentiary rules to allow the defendant to exclude portions of his confession pertaining to unrelated crimes. *See, e.g., Callis v. People*, 692 P.2d 1045, 1050 (Colo.1984) (whether to excise evidence of "prior criminality" from a confession "must be resolved within the framework of traditional rules of relevancy"); *State v. Nelson*, 331 S.C. 1, 501 S.E.2d 716, 723 (S.C.1998) (same).[14]

We need not consider the continued viability of the *Hipple* rule in its unqualified expression, however, because we find that Appellant is not entitled to relief even apart from any suggestion that his confession, as such, is admissible in its entirety. We note initially that Appellant described his drug activities in an asserted effort to avoid the death penalty by demonstrating that the killings were not premeditated, but were instead the culmination of a series of escalating events. *See* N.T. 12/11/96 at 310–11. Although Appellant was incor-

14. *See also Hoover v. Beto*, 467 F.2d 516, 529 (5th Cir.1972) (noting that, under the "principle of completeness," the "whole of a confession should be introduced, unless parts of it, reflecting the commission of other crimes ... can be excluded without damaging the whole" (citing 2 WHARTON'S CRIMINAL EVIDENCE § 361, at 68–74 (12th ed.1955))); *State v. Hart*, 691 So.2d 651, 659 (La.1997) (defendant may generally require excision of "other crimes" evidence from properly admitted confession). *But cf. Boggs v. Commonwealth*, 229 Va. 501, 331 S.E.2d 407, 419 (1985) (where a defendant's confession is voluntary, "he cannot be heard to complain that something he said might inflame the passions of the jury"); *Commonwealth v. Craft*, 447 Pa.Super. 371, 378, 669 A.2d 394, 397 (1995) (observing that, if a defendant waives the right to remain silent during a custodial interrogation, he is "informed that anything said may be used as evidence in a court of law") (per Del Sole, J., with two judges concurring in the result). Additionally, no exception for voluntary confessions is evident from the text of Rule 404's general exclusion of other-crimes evidence. *See* Pa.R.Evid. 404.

rect in supposing that knowledge of these events would preclude a finding of premeditation, to the extent his description of them (as recounted by Detective Logan) shed light upon his state of mind and motivation for his actions on the day in question, we agree with the trial court that they were properly admitted. In this regard, Detective Logan's references to Appellant's drug trafficking activities fall into two categories.

The first consists of a single instance in which the detective testified that Appellant purchased crack cocaine in New York and gave the drugs to his cousin, Tyrone, with instructions to transport them to Pittsburgh and then rendezvous with Appellant to give the drugs back. When the meeting failed to materialize, Appellant surmised that Tyrone had stolen the drugs. Anderson, however, was unsympathetic and proceeded to humiliate Appellant by intimating that she would have to find someone more capable of supplying her with money. This incident formed part of the background of events leading to Appellant's decision to kill Anderson and, in particular, bore upon the question of whether Appellant acted with malice. As an appropriate cautionary instruction was provided, the trial court did not abuse its discretion in refusing to redact the reference to drug trafficking inherent in this aspect of Appellant's confession.[15]

In the second category of Detective Logan's drug references, the detective twice referred to Appellant's having traveled to New York to obtain his "drug supply."[16] Logan's testimony in this regard was part of a description of an incident in which Appellant had gone to Manhattan and then returned earlier than expected in order to determine whether Anderson was seeing Lou. Appellant argues, with some validity, that the purpose of his trip to New York on this occasion could have been omitted without sacrificing any probative value, as the relevant point was that he returned unexpectedly

15. Appellant also maintains—without supporting argumentation or citation to authority—that the prejudicial effect of this drug reference outweighed its probative value. We find no merit to this contention.

16. Detective Logan also noted that Appellant claimed to have kept his drug "stash" in his grandmother's storage room.

and became upset when he observed Lou riding in Anderson's car. Nevertheless, such references were substantially similar to, and cumulative of, the other (properly-admitted) portion of Appellant's statement in which Appellant's conduct of transporting drugs from New York to Pittsburgh was delineated. Accordingly, any trial court error in this regard was harmless. *See Commonwealth v. Romero,* 555 Pa. 4, 15, 722 A.2d 1014, 1019 (1999).

 Next, Appellant submits that his counsel was ineffective for "not properly objecting" to other evidence of prior bad acts, and for failing to request a cautionary instruction. Appellant avers that such omissions cumulatively deprived him of a fair trial and penalty hearing. This claim implicates many of the concerns identified in *Grant.* For example, with the exception of Detective Logan's drug testimony discussed above, Appellant is raising this issue for the first time on appeal; hence, this Court is without the benefit of a trial court opinion, the lack of which "pose[s] a 'substantial impediment to meaningful and effective appellate review.' " *Grant,* 572 Pa. at 60, 813 A.2d at 733 (quoting *Commonwealth v. Lord,* 553 Pa. 415, 419, 719 A.2d 306, 308 (1998)).[17] Additionally, any demonstration that counsel's performance was constitutionally deficient—including that counsel had no reasonable basis for the alleged omissions—and that Appellant was prejudiced thereby, *see Commonwealth v. Pierce,* 515 Pa. 153, 158–59, 527 A.2d 973, 975–76 (1987), would have to be grounded upon "further fact-finding, extra-record investigation and, where necessary, an evidentiary hearing." *Id.* at 64, 813 A.2d at 736. "The trial court is the court that had the opportunity to observe counsel's performance firsthand and is therefore in the best position to make findings related to both the quality of trial

17. In his CURA petition, Appellant raised this issue only with respect to Detective Logan's drug testimony. The trial court rejected Appellant's claim, noting that counsel objected at trial and secured a cautionary instruction. *See* Trial Court op. at 26–27. Presently, Appellant additionally raises this ineffectiveness issue relative to Special Agent Bendetson's testimony that Appellant had used drugs in the 1980s, and that Appellant had seen himself on "America's Most Wanted," as well as Detective Logan's testimony that Appellant claimed to have fired his gun at other drivers on the Pennsylvania Turnpike.

counsel's performance and the impact of any shortfalls in that representation." *Id.* Thus, under rule announced in *Grant* and the reasoning on which that decision was based, this claim is not appropriate for disposition on direct review; it should be raised, if at all, in collateral proceedings.

In his final claim of error, Appellant complains of several statements made by the prosecutor during his closing argument in the guilt phase, and in his opening and closing statements in the penalty phase of trial. Appellant argues that these comments constituted prosecutorial misconduct and deprived him of a fair trial by interfering with the jury's ability to judge the case fairly based upon the evidence. He also asserts that trial counsel was ineffective in failing to object to any of these statements.

 Claims of trial error raised for the first time on appeal are waived. *See* Pa.R.A.P. 302(a). As this Court recently noted, moreover, "[b]elated ... attacks upon what happened at trial are better suited for consideration under a different rubric, such as ineffective assistance of counsel, where the proper focus is on the reasons counsel failed to raise an issue which was never brought to the trial judge's attention at a time when remedial measures might have been undertaken." *Freeman,* 573 Pa. at 550, 827 A.2d at 396, 2003 WL 21255941 at *4. While Appellant might be permitted to raise the claim of trial error for the first time on direct appeal pursuant to the relaxed waiver doctrine, application of that doctrine would, in any event, entail a consideration of the claim as if it had been advanced under the rubric of ineffective assistance of counsel. *See Commonwealth v. Hall,* 549 Pa. 269, 294 n. 14, 701 A.2d 190, 202 n. 14 (1997). Indeed, Appellant here specifically combines his waived claim of trial error with an assertion that trial counsel provided ineffective assistance by failing to object. The present claim of trial error thus essentially merges into Appellant's ineffectiveness claim. Hence, in accordance with *Grant* such claim should be raised, if at all, during collateral review.

■ Having concluded that Appellant's convictions were proper and that none of his claims of error entitle him to relief, we must affirm the sentence of death unless we find that: (i) the sentence was the product of passion, prejudice, or any other arbitrary factor; (ii) the evidence fails to support the finding of at least one aggravating circumstance; or (iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant. *See* 42 Pa.C.S. § 9711(h)(3);[18] *Commonwealth v. Lopez*, 559 Pa. 131, 165–66, 739 A.2d 485, 504 (1999).

■ Upon careful review of the record, we are persuaded that the death sentence was not the product of passion, prejudice, or any other arbitrary factor, but resulted from properly introduced evidence that Appellant intentionally and deliberately shot to death Beth Ann Anderson and her two minor children. We also conclude that the evidence was sufficient to support the aggravating factors found by the jury. *See supra* note 2. The fact that Appellant was convicted of all three homicides provides sufficient evidence for the aggravating circumstances that Appellant had been convicted of another offense for which a sentence of life imprisonment or death was imposable, *see* 42 Pa.C.S. § 9711(d)(10), and that he had been convicted of another murder. *See* 42 Pa.C.S. § 9711(d)(11). Furthermore, during the sentencing hearing the Commonwealth presented the birth certificates of Melanie Watkins and Kevin Kelley, which established that they were less than twelve years of age at the time of their deaths. *See* 42 Pa.C.S. § 9711(d)(16). We also note that Appellant stipulated to all aggravating circumstances found by the jury. *See* N.T. 12/13/96 at 664.

Finally, after careful review of the sentencing data complied by the Administrative Office of Pennsylvania Courts, and in

18. In 1997, the Legislature deleted the proportionality review requirement. *See* Act of June 25, 1977, No. 28 § 1. This Court undertakes such review in cases where the death sentence was imposed prior to June 25, 1997, the effective date of the repeal. *See Commonwealth v. Jones*, 571 Pa. 112, 123, n. 4, 811 A.2d 994, 1000 n. 4 (2002).

consideration of the circumstances of the crime and the character and record of Appellant, we find that the death sentences here are not excessive or disproportionate to the penalties imposed in similar cases. *See generally Gribble,* 550 Pa. at 86–92, 703 A.2d at 438–41. Accordingly, the verdicts and sentences of death are affirmed.[19]

Former Chief Justice ZAPPALA did not participate in the decision of this case.

---

19. The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania in accordance with Section 9711(i) of the Judicial Code. *See* 42 Pa.C.S. § 9711(i).