J-S29043-20

2020 PA Super 207

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                              :              PENNSYLVANIA
                                                :
           v.                                    :
                                              :
                                              :
KYLE LITTLE                            :
                                              :
               Appellant             :     No. 2775 EDA 2019

Appeal from the PCRA Order Entered August 23, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0900471-2006

BEFORE:  PANELLA, P.J., NICHOLS, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.:              **FILED AUGUST 24, 2020**

Kyle Little (Little) appeals the order of the Court of Common Pleas of Philadelphia County (PCRA court) denying his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. § 9541-9546, that he filed challenging his 2007 conviction following a jury trial where Little was found guilty of murder in the first degree (18 Pa.C.S. § 2702), as well as possession of an instrument of crime (18 Pa.C.S. § 907(A).  He was sentenced to a mandatory term of life without the possibility of parole on the murder count and a consecutive term of 1.5 years as to the weapon possession count.

_____

[*] Retired Senior Judge assigned to the Superior Court.

The PCRA court granted Little a resentencing[1] but denied a new trial due to lack of merit in Little's claims of newly-discovered evidence and ineffective assistance of counsel. Little now seeks review of the denial of those claims, arguing in part that his trial counsel was ineffective in failing to object to a ruling precluding the rehabilitation of the sole defense witness (Khaliaf "Chuck" Alston) whose testimony, if believed, would have been completely exonerating. The waiver of this issue prevented this Court from considering it on the merits in Little's direct appeal. For the reasons below, we hold that the PCRA court erred in denying Little's ineffectiveness claim on this ground and Little is granted leave to file a notice of appeal with this Court within 30 days from the date of this opinion solely raising that issue.

**I.**

**A.**

This case arises from the murder of Lamont Adams in September 2004.[2] It is difficult to summarize the central facts of that incident because the

---

[1] Little had asserted in his PCRA petition that his life sentence violated **Miller v. Alabama**, 567 U.S. 460 (2012), and **Montgomery v. Louisiana**, 136 S. Ct. 718 (2016), which prohibit mandatory life terms for juvenile offenders, and life terms absent consideration of special circumstances, respectively. The trial court granted relief on this claim, and the Commonwealth did not oppose it. **See** Trial Court 1925(a) Opinion, 8/23/2019, at 1 n.2.

[2] Our summary of the case facts is gleaned from the PCRA Court's 1925(a) opinion, the certified record and this Court's previous memorandum opinion. **See Commonwealth v. Little**, 2556 EDA 2011 (May 3, 2012, Pa. Super. 2012) (affirming judgment of sentence on direct appeal).

Commonwealth's two eyewitnesses, Hassan Kinard and Brandon Mundy, gave drastically different accounts of what they believe transpired. For introductory purposes, it suffices to say that these two witnesses testified consistently that Little shot Adams from behind with a .40-caliber firearm and continued shooting him after he had fallen to the ground, causing fatal injuries. *See* Trial Transcript, 11/6/2007, at p. 102; Trial Transcript, 11/7/2007, at p. 162. Forensic evidence showed that Adams was shot a total of 14 times with a similar type of weapon as the witnesses described.[3] Little's theory of defense at trial was that he was misidentified as the shooter and that Alston shot Adams.

Kinard was the first witness to come forward about Adams' murder. Approximately three months after the shooting, he was serving probation for drug-related offenses. While speaking with his probation officer about threats he was receiving in the neighborhood, he mentioned for the first time that he had seen Adams' murder. *See* Trial Transcript, 11/6/2007, at p. 130. That

---

[3] Approximately a month after Adams' death, police took Little into custody after he was seen discarding two .40 caliber firearms into a trashcan. The jury was instructed in Little's trial that there was no forensic link between those weapons and the firearm used to kill Adams. The jury could only use that knowledge to determine whether he "had familiarity with, knowledge of and the means to access .40-caliber handguns within approximately one month after the incident in his case." Trial Transcript, 11/14/2007, at pp. 26-27. Further, it was undisputed that Alston himself was known to carry a .40 caliber handgun and, in fact, this was the type of weapon police retrieved from him a few weeks before the shooting, causing his initial hostility toward Adams. *See* Trial Transcript, 11/7/2007, at p. 230.

same day, Kinard met with detectives who showed him a photo of Little and other individuals. *Id*. at p. 142.

In a second interview with different detectives about a week later, Kinard remarked on Little's photo as if he did not personally know him or of his involvement in the Adams' shooting, saying, "They said that this is the Kyle that killed Lamont [Adams]." *Id*. at p. 142. At no point did Kinard ever say that Khaliaf "Chuck" Alston was present at the scene of Adams' murder.

Further describing a separate gun-related incident, Kinard referred to Ronald "Ronnie" Alston as Adams' killer: "it was Ed, Kyle [Little] and the boy that killed Lamont [Adams], I think they call him Ronnie[.]" *Id*. at p. 149. Kinard changed his mind about Ronnie's involvement when he realized while speaking to detectives that Ronnie could not have shot Adams because no "sparks" had come off the gun he was holding. Trial Transcript, 11/7/2007, at p. 78. Kinard further explained that he "thought [he] saw [Ronnie] shoot, but he didn't." *Id*. at p. 80.

At trial, Kinard retracted his earlier statements implicating Ronnie and identified Little as the sole shooter, describing the incident as follows: Kinard was walking up the street in the area near the shooting when he came across Little and Ronnie. *Id*. at p. 91. Kinard greeted them as they walked past him

in the opposite direction and Little said in reference to Adams, "I'm about to go get that ni\*\*er." *Id*. at p. 97.[4]

Soon thereafter, Kinard heard Little and Ronnie arguing loudly with Adams, and when Adams walked a few steps away, Little shot him. *Id*. at p. 92. Kinard testified that Ronnie had drawn his own weapon while Adams was being shot, but that he was positive Ronnie did not open fire. *Id*. at p. 124.

Kinard attempted to explain that when he gave earlier inconsistent statements such as telling the detectives that he thought he saw "Ron shoot too," he was confused by the repetitive questions asked "over and over" again by detectives over a period of "hours". *See id*. at p. 170; *see also* Trial Transcript, 11/7/2007, at pp. 67-71. He maintained that his trial testimony reflected what had really happened and that his earlier accounts were inaccurate.

The Commonwealth's second eyewitness, Mundy, contradicted Kinard in several ways. To begin with, Mundy testified that Kinard and Ronnie were not even there to observe the shooting. *See* Trial Transcript, 11/7/2007, at pp. 154, 161, 215-17. Just as noteworthy as the absence of Kinard and Ronnie in Mundy's account was the presence of Alston.

---

[4] In his earlier statement to police, Kinard attributed this comment to both Little and Ronnie. *See* Trial Transcript, 11/7/2007, at pp. 62-70. Furthermore, unlike in his trial testimony, Kinard omitted from his statements to police that he had seen Little and Adams arguing loudly prior to the shooting. *Id*. at pp. 165-66, 169.

According to Mundy, the shooting stemmed from an incident in July 2004 during a game of dice between Adams, Little, Alston and a number of other players. *See id*. at p. 149. Adams lost all of his money, and as he walked away, he was seen talking on a cellular phone. Minutes later, police arrived near the scene of the dice game and arrested Alston for possessing a firearm. *Id*. at p. 151.

By September, Alston had been released from custody but he harbored a grudge against Adams, believing that he had called the police in retaliation for losing in the dice game. While outside together that night near the corner of North 26th Street and West Cambria Street, Little, Alston and several others saw Adams walk by. Alston then said, "That's the boy that told on me . . . I'm about to go pop him." *Id*. at pp. 148, 153.

Mundy testified that Alston had asked his brother, Ronnie, to get a gun after Adams walked past them and Ronnie then then left for 10 to 15 minutes. *Id*. at pp. 208-09. Another member of the group, Matt, said he was willing to shoot Adams, to which Little replied, "I got it. I got it." *Id*. at pp. 208, 248-49.

Unlike Kinard, who had testified that Ronnie was next to Little and drawing a weapon as Adams was shot, Mundy testified that Ronnie had left and had not returned until after the shooting was over. *Id*. at pp. 148, 155, 209, 217. Additionally, Mundy stated that only Alston was angry with Adams for calling the police after the dice game months earlier and that Little had no

personal dispute with him. *Id*. at p. 229. Mundy even had to physically restrain Alston from attacking Adams when he initially walked past their group the day of the shooting. *Id*. at pp. 251-52.

**B.**

Defense counsel for Little presented one witness, Alston, who testified that he alone shot Adams. *See* Trial Transcript, 11/13/2007, at p. 32. Alston confirmed that he had conferred with his own counsel and been advised of how admitting to Adams' murder could potentially be used against him. *Id*. at pp. 24-26, 46-47. He stated that he was currently serving two consecutive sentences of life without parole for a second-degree murder conviction and a third-degree murder conviction as well as other lesser offenses. *Id*. at pp. 28-32.

Alston testified that on the day of the murder, he saw Adams walking up the middle of the street near where he was standing. *Id*. at p. 35. He was nervous in that moment because Adams had robbed him at gunpoint about a week earlier. *Id*. at p. 33. Further, it appeared to Alston as if Adams was reaching under his shirt for a weapon while walking toward him, so Alston felt he had to open fire to protect himself. *Id*. at p. 37.

Although Adams had fallen down after the first shots, Alston testified that he kept shooting at Adams in case he was armed: "[T]hen I kept shooting him because I wanted to make sure he didn't get up and shoot me, I didn't know if he had a gun on him." *Id*. Alston testified that Little, Kinard and

Ronnie were not present to witness the shooting, but that Mundy was there that night and took away the weapon that Alston had used. *Id*. at p. 40.

Defense counsel attempted to ask Alston on direct examination if he was aware that he could potentially face the death penalty for killing Adams but the trial court sustained the Commonwealth's objection to the question. *Id*. at p. 47. Next, defense counsel attempted to ask Alston if he could anticipate what would happen to him because of his testimony and again the trial court sustained the Commonwealth's objection. *Id*. at pp. 47-48.

The first question the Commonwealth asked Alston on cross-examination was whether he was serving two consecutive life sentences. *Id*. at pp. 48-49. Alston answered that he was. *Id*. The Commonwealth's second question was, "So as you sit here in court, you are never getting out of jail; correct?" *Id*. at p. 49. Alston again answered affirmatively. *Id*.

At a sidebar moments later concerning the scope of the cross-examination, the Commonwealth explained that it sought to elicit facts about other cases in which Alston had testified favorably for friends standing trial. *Id*. at pp. 53-56. In those other cases, Alston had claimed that the wrong person had been charged but he did not admit he had committed the crimes. *Id*. The Commonwealth nevertheless speculated that Alston had developed a pattern of testifying for his friends, and that once Alston's own trial had concluded, his "motives ha[d] changed" and he no longer had the need to

defend himself. *Id*. at p. 54. The Commonwealth believed that unlike in the earlier trials, Alston "is serving his life sentences, he has nothing to lose." *Id*.[5]

Defense counsel responded that Alston had never before testified in other cases as a self-admitted guilty party, and that by taking the blame in Little's case, he potentially faced the death penalty. Defense counsel again asked to question Alston about his awareness of such exposure:

> **Defense counsel**: [If the Commonwealth gets] into the fact that he has nothing to lose, then on redirect, so the Court isn't surprised, I'm going to ask him, you have been advised that if you testify in this case you could be arrested for first-degree murder and face the death penalty, so he does have something to lose by this testimony in this courtroom.
>
> **The Commonwealth**: He's never going to be prosecuted for the murder of Lamont Adams, he has nothing to lose.
>
> **Defense Counsel**: Well, I don't know that.

*Id*. at pp. 64-65.

The trial court established that Alston indeed would qualify for the death penalty but then ended the sidebar without explicitly ruling on defense counsel's proposed re-direct. *Id*. at pp. 65-66. Immediately upon beginning the re-direct, defense counsel confirmed that Alston was 19 years old at the

---

[5] Alston was interviewed by police a few months after the Adams' shooting and admitted he was present in the area but denied being the shooter and gave no further statements at that time.

time of the subject shooting, establishing one of the requisites of death-penalty eligibility. *Id*. at pp. 95-96.[6]

The next question concerned the potential consequences Alston faced by testifying at Little's trial. At that point, the Commonwealth objected on the grounds of relevance and the trial court sustained the objection. Defense counsel again requested a sidebar and moved *in limine* to preclude the Commonwealth from arguing to the jury that Alston had "nothing to lose by coming into this court and giving his testimony." *Id*. at pp. 96-98.

Defense counsel also proffered that since the Commonwealth was allowed to elicit on cross-examination that Alston was serving two life sentences, then he would seek to ask Alston on re-direct if he understood that "he could be subject to being arrested and charged with first-degree murder and facing a possible sentence of death." *Id*. The trial court ordered defense counsel not to ask such a question because "whether he could be subject to death, that's too much speculation as between now and then[.]" *Id*. Defense

---

[6] A defendant may be eligible for the death penalty in Pennsylvania if, during the commission of a first-degree murder, he was over the age of 18, and a jury finds there to be aggravating circumstances, including the commission of a felony during the killing, such as illegal possession of a firearm. *See* 42 Pa.C.S. § 9711(d)(6); *see also Roper v. Simmons*, 543 U.S. 551 (2005) (holding that subjecting juveniles under the age of 18 to the death penalty violates the Eighth Amendment). Another potentially applicable aggravator against Alston would be that the victim was killed in retaliation for providing police with information concerning criminal activity. *See* 42 Pa.C.S. § 9711(d)(15).

counsel acknowledged the ruling by replying, "Very well," and once the examination resumed, the trial court sustained the Commonwealth's earlier objection. *Id*. at p. 98.

**C.**

After Alston's testimony had concluded and in preparation for closing statements, defense counsel sought to limit the Commonwealth's ability to argue that Alston would face no consequences for his testimony. In another motion *in limine*, defense counsel stressed that Alston's exposure to the death penalty would make it misleading for the Commonwealth to suggest that he had nothing to lose from taking the blame for Adams' murder. Defense counsel asked in the alternative to rehabilitate Alston by countering the Commonwealth's claim and explaining that Alston would be death-penalty eligible.

The trial court denied the defense's motion in all respects, permitting the Commonwealth to argue that Alston had "nothing to lose," but precluding the defense from arguing that Alston faced a potential execution in the event of his prosecution for the murder of Adams. The trial court found that the possibility of a death penalty would be irrelevant because there was no evidence that the Commonwealth intended to bring that charge against Alston – "whether or not he's going to be charged and would be facing the death penalty, I just don't know why that's relevant in this case." *Id*. at p. 126.

The trial court overlooked what Alston may have subjectively thought would come of his admission, instead finding that since the Commonwealth did not find Alston credible, it was unlikely that he would ever be charged, making the death penalty immaterial. *Id*. at pp. 124-31.[7] The trial court did not refer to any certification from the Commonwealth that Alston had official immunity relating to Adams' murder and the record contains no evidence to that effect.

Having prevailed on the defense's motion *in limine*, the Commonwealth addressed Alston's testimony during closing argument in large part by attacking his credibility. *Id*. at pp. 194-96. The Commonwealth attempted to undermine Alston's testimony by stressing that his sole motive was to do Little a favor and not to unburden his own conscience. *Id*. The jury was told further that Alston could lie on the stand without fear of any practical consequences: "Khaliaf Alston is serving two consecutive life sentences, of course he can get up here and say whatever he wants." *Id*. at pp. 195-96.

**D.**

Little was found guilty and sentenced as outlined above. He filed a direct appeal, *nunc pro tunc*, in 2011, and one of the issues he raised was whether

---

[7] Once the trial court denied defense counsel's motion to restrict the Commonwealth's closing argument and instead restricted the defense's closing, counsel did not object (or renew an objection) to the earlier ruling limiting the scope of Alston's examination.

the trial court had erred in prohibiting defense counsel from rehabilitating Alston's credibility after the Commonwealth had elicited that Alston was serving two consecutive life sentences in unrelated cases.[8] This Court held that the issue was waived for the purposes of direct appeal because when the trial court limited defense counsel's re-direct examination of Alston, defense counsel seemed to acquiesce to the ruling without reasserting an objection:

> [T]he issue of the extent to which Little could examine Alston regarding the consequences of his admission of guilt in shooting Adams was joined by the parties and the trial court. The trial court ruled that Little could ask Alston if he understood that he could be convicted for Adams' murder, but could not further ask Alston if he understood that a possible sentence for such a conviction is death. **Counsel for Little agreed with this resolution of the issue and did not reassert his objection or otherwise express any disagreement with the trial court's resolution. Instead, he merely said "Very well" and moved on with his examination of Alston**.

*Commonwealth v. Little*, 2556 EDA 2011, at *20 (Pa. Super. November 27, 2012) (emphasis added).

Accordingly, we disposed of the issue by finding that the lack of preservation had rendered the claim procedurally barred on direct appeal. *See id*. This Court did not reach the merits of Little's claim of error, and after

---

[8] Little's initial direct appeal was dismissed as untimely. The PCRA court granted a direct appeal *nunc pro tunc* on September 16, 2011, and ordered that Little file a 1925(b) statement. Little complied and raised, *inter alia*, the claim that trial counsel had failed to preserve the rehabilitation issue with respect to Alston. The trial court filed a 1925(a) opinion, stating broadly that the reasons given on the record for all disputed evidentiary rulings were within the court's discretion. *See* Trial court opinion, 5/3/2012, at pp. 5-6.

his judgment of sentence was affirmed, *see id*., our Supreme Court denied Little's petition for allowance of appeal. *See **Commonwealth v. Little***, 582 EAL 2012 (Pa. June 26, 2013).

Little timely filed a *pro se* PCRA petition in 2013, asserting that his life sentence was illegal under new and controlling federal law prohibiting mandatory life sentences for juvenile offenders. *See* Amended PCRA Petition, 12/7/2013, at 5-10. In 2014, Little amended his PCRA petition, adding claims of ineffective assistance of counsel. He asserted that his trial counsel failed to (1) object to the limited scope of Alston's testimony regarding potential penal consequences for his admissions to Adams' murder; (2) seek a curative instruction to improper prosecutorial comments following several sustained defense objections; and (3) adequately consult with Little prior to trial. *See* Amended PCRA Petition, 4/30/2014, at 3-4.

Little also added a claim of after-discovered evidence relating to the misconduct of an investigating officer, Detective Ronald Dove, who would eventually plead guilty on April 25, 2017, to several offenses for tampering with the prosecution of a murder in subsequent, unrelated cases. *Id*. at 4. Little filed yet another amended PCRA petition later that year, adding an after-discovered evidence claim based on the new affidavit of Steven Hassell, who averred that he saw Alston standing over Adams and shooting him. *See* Amended PCRA petition, 10/26/2014, at 26.

The final version of Little's PCRA petition was filed in 2015 with the benefit of counsel. **See** Amended PCRA Petition, 6/26/2015. This petition incorporated all of the issues raised in the earlier iterations, along with a claim of cumulative error. **See id**. Little successfully moved to supplement his claims with then-newly published federal case law on the juvenile sentencing issue in 2016. **See** Supplement to PCRA Petition, 3/7/2016, at 5-6.

The PCRA court held a hearing on Little's PCRA claims March 10, 2017. The sole witness at the hearing, Hassell, testified that on the day of the incident, both Adams and Alston walked past him on the sidewalk of a street, and that he was very familiar with both of them, having lived for years in the same neighborhood. **See** Transcript PCRA Hearing, 3/10/2017, at pp. 4-6. Moments later, from about two blocks away, Hassell saw Alston holding a gun and standing over Adams on the sidewalk after he had heard gunshots ring out. **See id**. at pp. 12, 14, 41-43. Hassell did not actually see Adams being shot, but he stated he was sure of Alton's identity as the shooter. **Id**. at p. 14, 22.

Hassell did not come forward sooner about what he had seen because cooperating with the police was frowned upon in his neighborhood. **Id**. at p. 15. He did not change his mind until years later when he was incarcerated

for a separate matter and learned that Little was serving time in the same facility for the murder of Adams. *Id*. at pp. 16-20, 22.[9]

Approximately two-and-a-half years after the hearing on Little's PCRA claims had concluded, the PCRA court entered its opinion and order. The PCRA court found merit in Little's sentencing issue and ordered that he be resentenced. *See* 1925(a) Opinion, 8/23/2019, at 1.

The PCRA court denied the remaining claims of after-discovered evidence and ineffective assistance of counsel. As to Little's claim based on Hassell's testimony, the PCRA court found the witness lacked credibility in large part because Hassell's testimony contradicted his affidavit as to how close he was to Adams and Alston at the time of the shooting. *Id*.

The PCRA court also rejected all of Little's ineffectiveness claims, finding first that defense counsel could not have been ineffective at trial for failing to renew an objection as to limits on the examination of Alston. The PCRA court found that it would have been futile for defense counsel to object to the restriction on questions to Alston regarding a potential death penalty in the event of his prosecution for Adams' murder, reasoning that such a result would

_____

[9] In his testimony and affidavit, Hassell stated that a fellow inmate other than Little had encouraged him to report what he had seen, and that neither Little nor anyone else had any hand in preparing the content of his affidavit. However, Little had stated in his own affidavit submitted with his PCRA claims that he had, in fact, met with Hassell to coordinate the preparation of Hassell's affidavit.

have been extremely unlikely because the Commonwealth doubted his credibility and was unlikely to charge him. *Id*. at 7-8. The PCRA court ignored whether Alston nevertheless had reason to fear prosecution for Adams' murder based on his sworn testimony.

Further, the PCRA court found that the record precluded relief on the other ineffectiveness claims because there was no reasonable likelihood that requests for curative instructions or more pre-trial consultation between Little and his counsel would have resulted in a different outcome in light of the evidence establishing his identity as Adams' killer. *Id*. at 9-10. The PCRA court did not address Little's remaining claim of after-discovered evidence as to Detective Ronald Dove.

Little timely appealed the order denying his claims[10] and he now raises six issues in his brief, only one of which we will consider in depth:

> Was [Little] denied his Sixth Amendment right to effective assistance of counsel when counsel agreed to and/or failed to renew his objection as to the scope of Alston's questioning concerning the potential consequences of his testimony thereby waiving appellate review?

Appellant's Brief, at 3.

---

[10] Although the order on review was dated "July 19, 2018" and docketed on July 19, 2019, the order bears a date stamp of August 23, 2019. Little appealed on September 15, 2019, and since nothing in the record explains the discrepancy, Little's notice is considered to be timely filed within 30 days of the date his PCRA petition was partly denied.

- 17 -

## II.

The sole issue we find dispositive in this appeal is whether Little's trial counsel was ineffective in failing to object to the trial court's restriction on the scope of Alston's testimony; the denial of all other claims is affirmed for the reasons set forth in the PCRA court's opinion.

To be eligible for relief under the PCRA, an appellant must show that his conviction resulted from one of several enumerated causes, including the ineffective assistance of counsel. *See* 42 Pa.C.S. § 9543(a)(2)(ii); *see also Strickland v. Washington*, 466 U.S. 668 (1984); *Commonwealth v. Pierce*, 527 A.2d 973, 975–76 (Pa. 1987). Counsel is presumed to have provided effective representation unless the petitioner pleads and proves all three of following prongs of a PCRA claim:

1. the underlying legal claim is of arguable merit;

2. counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and;

3. as a result of counsel's action or inaction, the petitioner suffered prejudice.

*See generally Pierce*, 527 A.2d at 975-76.

The PCRA court may deny an ineffectiveness claim if "the petitioner's evidence fails to meet a single one of these prongs." *Commonwealth v. Basemore*, 744 A.2d 717, 738 n.23 (Pa. 2000); *Commonwealth v. Hall*,

872 A.2d 1177, 1184 (Pa. 2005) (same). Each of these three prongs are addressed in turn below.[11]

### III.

### A.

Little's claim that defense counsel erred has arguable merit. He was charged with murder and the Commonwealth presented two eyewitnesses who identified him as the perpetrator. The defense presented the testimony of one witness at trial, Alston, who contradicted those witnesses by admitting to the murder himself. The jury's verdict necessarily turned on whether it found Alston credible enough to raise a reasonable doubt about Little's guilt.

To show that Alston faced potential adverse consequences for his testimony, defense counsel sought to question him on whether he believed he would be death-penalty eligible if charged with murdering Adams. This was critical because the Commonwealth had successfully impeached Alston's credibility by eliciting that he was serving two consecutive life sentences for unrelated cases, and he had testified as a defense witness in two other defendants' trials.

---

[11] "On appeal from the denial of PCRA relief, our standard of review calls for us to determine whether the findings of the PCRA court are supported by the record and are free from legal error." **Commonwealth v. Williams**, 980 A.2d 510, 518 (Pa. 2009).

During argument on the defense's motions *in limine*, the Commonwealth also described its plan to use Alston's life sentences as evidence that he had "nothing to lose" from admitting to Adams' murder. That is, the Commonwealth was setting the stage to convince the jury that Alston would be free to give a false confession as a favor to Little, since it was supposedly impossible for Alston to incur any further punishment than had already been imposed in his other cases. In its closing argument, the Commonwealth indeed went on to discredit Alston by arguing that he could "say whatever he wants" at Little's trial with impunity. ***See*** Trial Transcript, 11/13/2007, at pp. 194-95.

Defense counsel recognized that the only way to refute the Commonwealth's false inference was to point out that Aston ***did*** have something to lose because of admitting to Adams' murder. As a matter of fact and law, Alston would have indeed been exposed to a death penalty in the event that the Commonwealth opted to charge him with the murder of Adams.[12] In ruling that Alston's exposure to the death penalty was irrelevant, inadmissible and speculative, the trial court arguably misapplied the law.

---

[12] It was established during the hearing on defense counsel's *in limine* motions that Alston was over the age of 18 when Adams' murder occurred, and that there were aggravating circumstances exposing Alston to the death penalty in the event of prosecution. ***See*** 42 Pa.C.S. § 9711(d).

"Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. 2002) (citation omitted).

When a party's witness is attacked for bias or accused of having a motive to lie, counsel for that party should be allowed to respond in kind with relevant, admissible evidence that refutes the attack. *See Commonwealth v. Griffin*, 515 A.2d 865, 872–73 (Pa. 1986) (if a witness's credibility is attacked, then counsel should be allowed to rehabilitate that witness "to rebut accusations or suggestions of fabrication or corruption").

Pennsylvania has long recognized that a witness's admission to a crime is considered more reliable and therefore admissible since its "trustworthiness is safeguarded by the improbability that a declarant would fabricate a statement which is contrary to his own interests." *Commonwealth v. Colon*, 337 A.2d 554, 556 (Pa. 1975); *see also Chambers v. Mississippi*, 410 U.S. 284, 299 (1973) (it is assumed that "a person is unlikely to fabricate a statement against his own interest at the time it is made.").

Indeed, such statements are considered so "inherently trustworthy" that they are accepted from the general prohibition on hearsay at trial. *Commonwealth v. Statum*, 769 A.2d 476, 479 (Pa. Super. 2001) (quoting *Commonwealth v. Hackett*, 307 A.2d 334, 338 (Pa. Super 1973)). It is the

- 21 -

possibility of criminal prosecution, not just the likelihood of prosecution, which lends weight to an admission. *See Statum*, 769 A.2d at 480 ("regardless of the *likelihood* of her prosecution, [the witness'] statement was obviously self-incriminatory and unquestionably against her own penal interest . . . she clearly was aware of the possibility that her disclosure would lead to criminal prosecution[.]") (emphasis in original).

In this case, the Commonwealth suggested that Alston's confession was not truly against his penal interests because prosecution would have no practical effect on him. The defense should have been allowed to rebut that inference by showing that Alston's confession subjected him to capital punishment. As the Commonwealth's own logic implies,[13] any punishment Alston could have incurred because of his trial testimony would be highly relevant. The jury could not have made an informed determination as to Alston's credibility without weighing whether Alston believed exposure to capital punishment was against his interests.[14]

_____

[13] The Commonwealth argued that Alston could afford to give a false confession in exchange for favor with Little because no penal consequences would ensue. It follows from that argument that if Alston did face the death penalty, he would have less incentive to testify falsely or more reason to deny his own guilt.

[14] "Credibility involves an assessment of whether or not what the witness says is true; this is a question for the fact finder." *Commonwealth v. Delbridge*, 855 A.2d 27, 40 (Pa. 2003). "[T]he trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part,

Despite the import of defense counsel's proffered examination, the trial court restricted the scope of Alston's testimony and prevented the defense from rehabilitating a key witness who, if believed, would have completely exonerated Little. Thus, there is arguable merit in Little's claim that defense counsel performed deficiently in failing to preserve the issue for review on direct appeal where the trial court's error could have possibly been corrected.

**B.**

Defense counsel had no reasonable basis for failing to make an objection sufficient to preserve the issue for direct appeal. As this Court has already held, defense counsel thoroughly raised the issue to no avail but then inexplicably declined to "reassert his objection or otherwise express any disagreement with the trial court's resolution." **See Little**, 2556 EDA 2011, at *20.

To determine if there was a "reasonable basis," the PCRA court does "not question whether there were other more logical courses of action which counsel could have pursued; rather, [the court] must examine whether counsel's decisions had any reasonable basis." **Commonwealth v. Hanible**, 30 A.3d 426, 439 (Pa. 2011). A PCRA court may find that counsel's strategy lacked a reasonable basis if the petitioner proves that a foregone alternative

---

or none of the evidence." **Commonwealth v. Watkins**, 843 A.2d 1203, 1211 (Pa. 2003).

"offered a potential for success substantially greater than the course actually pursued." ***Commonwealth v. Bardo***, 105 A.3d 678, 684 (Pa. 2014) (quoting ***Commonwealth v. Spotz***, 18 A.3d 244, 260 (Pa. 2011)).

As to the present case, our evaluation is guided by our discussion in Little's direct appeal. There, we held that counsel failed to preserve the issue at hand after the trial court had already barred him from rehabilitating Alston during his examination. Counsel apparently opted to agree with the clearly detrimental ruling and the result of declining to object is that Little lost an arguably meritorious issue that could have afforded him a new trial.

There was no strategic calculation on the part of defense counsel for the lack of a timely objection. To the contrary, Little's trial counsel himself articulated the significance of Alston's credibility and the force of the Commonwealth's claim that Alston was, in effect, immune from further penal sanction. The only means defense counsel had to refute the Commonwealth's untrue insinuation was to elicit from Alston and then argue to the jury that his admission exposed him to capital punishment (which it did), making Alston's decision to testify that much more credible.

Moreover, the absence of a strategy in waiving the appellate issue is evident from the behavior of defense counsel, who obviously thought he *had* done everything needed to preserve the issue for appeal. Defense counsel urged during Alston's direct, cross and re-direct examinations that Alston's exposure to capital punishment should have been fair game. Counsel also

- 24 -

repeated those arguments prior to the Commonwealth's closing statements. Each time, the trial court found that it was "irrelevant" whether Alston knew he was death-penalty eligible. That finding was echoed in the trial court's 1925(a) opinion. *See* 1925(a) opinion, 5/3/2012, at 5.

The defense gained no advantage from omitting the one minimal step necessary to preserve the issue for direct appeal. The *only* practical outcome of that omission is that, as this Court has already held, the issue was waived and could not be considered on the merits, barring Little from an appellate remedy. *See Little*, 2556 EDA 2012, at **19-20. Thus, Little easily satisfies the second prong of his ineffectiveness claim.

## C.

Last, we address the prejudice prong of Little's claim which hinges on whether he can show there is a "reasonable probability" that the "result of the proceeding" would have been different but for counsel's action or inaction. *Commonwealth v. King*, 57 A.3d 607, 613 (Pa. 2012) (quoting *Strickland*, 466 U.S., at 694); *Commonwealth v. Kimball*, 724 A.2d 326, 330-32 (Pa. 1999) (same). When considering the asserted proof of prejudice, courts should avoid "mechanical" application of the rules and instead consider the totality of the circumstances surrounding any given claim of ineffectiveness. *Pierce*, 527 A.2d at 974-75 (quoting *Strickland*, 466 U.S., at 696). The United States Supreme Court instructed in *Strickland* that fairness and reliability in the proceedings are the foundations of the prejudice inquiry:

the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

**Strickland**, 466 U.S., at 696.

In this case, Little argues that trial counsel committed an error that influenced his direct appeal. As outlined above, defense counsel repeatedly sought to elicit evidence that would refute the Commonwealth's suggestion that Alston had "nothing to lose" from testifying. Defense counsel presented the grounds for why rehabilitation on that point was relevant, permissible and vital to the defense's case, but the trial court ruled that it was completely irrelevant. The issue could not be raised on direct appeal because even though defense counsel raised the issue, he failed to properly object to the trial court's restrictions.

Generally, a PCRA petitioner alleging an ineffectiveness claim must show that counsel's error resulted in a different outcome of the proceedings and this pertains to the "stage where the alleged ineffectiveness took place[.]" **Commonwealth v. Mallory**, 941 A.2d 686, 703 (Pa. 2008); **see also Strickland**, 466 U.S., at 696 (the post-conviction inquiry concerns the fairness of "the proceeding whose result is being challenged."); **Commonwealth v. Reaves**, 923 A.2d 1119, 1131-32 (Pa. 2007) (holding that counsel's failure to object to sentencing procedures was prejudicial if it affected the length of the sentence, not the issues available on appeal).

- 26 -

A "reasonable probability" is a degree of likelihood "sufficient to undermine confidence in the outcome of the proceedings." ***Commonwealth v. Collins***, 957 A.2d 237, 244 (Pa. 2008). This reasonable probability "test is not a stringent one," as it is "less demanding than the preponderance standard." ***Commonwealth v. Hickman***, 799 A.2d 136, 141 (Pa. Super. 2012).

Under a strict interpretation of this framework, defense counsel's deficient performance at trial – failing to renew an objection and thereby waiving an appellate issue – could have had no immediate effect on the outcome of Little's verdict at the trial stage of the proceedings. Had defense counsel objected as required to preserve the claim for direct appeal, the trial would have still proceeded in the exact same fashion as it did, as is evident from the trial court's rejection of the defense's arguments on relevance grounds.

However, in light of the totality of the circumstances, a conclusion of no prejudice would be inconsistent with ***Strickland's*** mandate to focus on the overall integrity of the proceedings and avoid mechanical application of the rules.[15] To address the inequity of incurable harm in the scenario presented

---

[15] If an issue is fully raised at trial yet not preserved for appeal, the deficiency in counsel's performance would not be the cause of the improper admission of the evidence; only the trial court's ruling would be. Counsel's error would not come into play until after the judgment of sentence has been entered, eliminating potential relief at the appellate stage.

by cases like this one, some federal jurisdictions[16] have broadened the general standard for prejudice, holding that a waiver of an appellate claim by trial counsel may be considered prejudicial when the impact of the error does not rear its ugly head until the appellate stage.

In *Davis v. Secretary for Dept. of Corrections*, 341 F.3d 1310 (11th. Cir. 2003), for example, the Eleventh Circuit Court of Appeals recognized that trial counsel's waiver of an appellate issue may satisfy the prejudice prong of an ineffectiveness claim. The petitioner in *Davis* had been on trial for murder

---

[16] We have found no Pennsylvania case that squarely considers the narrow issue now before us – whether the PCRA prejudice prong may be satisfied where trial counsel has fully raised but not preserved for direct appeal an evidentiary error that could have affected the verdict. In a related yet distinguishable case, *Reaves v. Commonwealth*, 923 A.2d 1119, 1132 n.13 (Pa. 2007), our Supreme Court held that counsel's failure to object could not satisfy the prejudice prong of a PCRA claim because the "proper initial focus of assessing prejudice is upon the proceeding where counsel defaulted in the objection," not upon the outcome of the appeal taken from the sentence. *Reaves* differs from this case because there, counsel failed to make a procedural challenge which would have required the sentencing court at a probation violation hearing to state on the record the reasons for the sentence imposed. The failure to object barred some sentencing claims on direct appeal. The *Reaves* Court reasoned that the default deprived the sentencing court of a chance to take any necessary corrective measures, and that prejudice under those circumstances could only be proven by showing that an objection would have immediately led to a more favorable sentence. Little's case is different because defense counsel rigorously objected as to an evidentiary matter regarding the ultimate question of guilt, not just a procedural matter at sentencing. Unlike in *Reaves*, the petitioner here can articulate how he suffered actual prejudice due to trial counsel's mistake. Futhermore, despite counsel's failure to preserve the issue for appeal, the trial court had every opportunity to address the error, making the claim of actual prejudice concrete and not merely speculative as in *Reaves*.

and burglary, and during *voir dire*, his counsel made meritorious **Batson** challenges[17] to the prosecution's improper striking of black venire members. The trial court overruled the objection to the strikes, but counsel did not renew the challenge prior to the empaneling of the jury, as would be required to preserve the issue for appellate review under the applicable state law. **Davis**, 341 F.3d, at 1314.

The **Davis** petitioner was found guilty, and when he raised the **Batson** issue on direct appeal, the court found it waived and affirmed his convictions. **Id**. at 1312. The petitioner then sought recourse at the post-conviction stage, arguing that his trial counsel's performance was deficient due to failing to preserve a meritorious issue for appeal that would have afforded him relief. **Id**. His claim was denied on the ground that counsel's error did not result in a different outcome at trial since the issue was fully raised and litigated, albeit not cognizable on appeal due to counsel's error. **Id**.

The Eleventh Circuit then considered, as a matter of first impression in federal court, whether post-conviction relief would be due when the asserted error by trial counsel concerns the "failure in his separate and district role of preserving error for appeal," and "the only possible impact is on the appeal." **Id**. at 1316. The court held that "when a defendant raises the unusual claim that trial counsel, while efficacious in raising an issue, nonetheless failed to

---

[17] **See Batson v. Kentucky**, 476 U.S. 79 (1986).

preserve it for appeal, the appropriate prejudice inquiry asks whether there is a reasonable likelihood of a more favorable outcome on appeal had the claim been preserved." ***Id***. at 1316.

Based on the applicable standard of review for ***Batson*** claims, the ***Davis*** court found there was a reasonable probability that had the issue been preserved for direct appeal, the defendant's convictions would have been reversed, establishing prejudice for post-conviction purposes. ***Id***. To remedy that harm, the court directed that the petitioner would be entitled to reassert the waived claim in a "freestanding" direct appeal, *nunc pro tunc*. ***Id***. at 1317.

The Eleventh Circuit later clarified it had only created a "razor thin" exception, intended to be applicable in rare situations when the "failure of counsel was solely in his role as appellate counsel at trial[.]" ***Purvis v. Crosby***, 451 F.3d 734, 739 (11th Cir. 2006). The court stressed that the holding of ***Davis*** was drawn narrowly, and that in the more usual cases where an issue was simply not raised at all, the resulting appellate waiver would not satisfy ***Strickland's*** prejudice standard for ineffectiveness as to an error by trial counsel. ***See id***. at 740; ***see also U.S. v. Thompson***, 463 Fed. Appx. 887, 890 n.3. (11th Cir. 2012) (unpublished opinion recognizing continuing vitality of ***Davis'*** narrow holding).

This appeal involves the same set of unusual circumstances that warranted relief in ***Davis***. Little's trial counsel raised a meritorious issue and received a ruling, but then fell short of preserving the claim for Little's direct

appeal. Had counsel objected as required to preserve the issue, nothing at trial would have changed because the subject error would have gone uncorrected. The sole difference would be that on direct appeal, the Commonwealth would have had the burden of proving beyond a reasonable doubt that the trial court's error in limiting Alston's testimony was harmless.[18]

In that hypothetical analysis, this Court on direct appeal would have had to consider that Little's trial was essentially a credibility contest between Alston and the Commonwealth's two eyewitnesses, both of whom gave wildly different accounts of the shooting. The limitation on Alston's testimony indisputably had significant bearing on whether his admission was against his penal interest, a factor that weighs heavily on the scales of credibility.

In cases where the fact-finder must necessarily make a credibility determination as to a pivotal witness, the erroneous exclusion of evidence pertaining to the witness' credibility may be found prejudicial and not harmless beyond a reasonable doubt. *See e.g., Commonwealth v. Story*, 383 A.2d 155, 168-69 (Pa. 1978) (reversing murder conviction where jury heard irrelevant and inflammatory evidence of victim's family life, which could have swayed its critical credibility determinations); *Commonwealth v. Palmore*,

_____

[18] On direct appeal from a judgment of sentence, the Commonwealth must prove that trial court error is harmless beyond a reasonable doubt. *See generally Commonwealth v. Story*, 383 A.2d 155, 162 (Pa. 1978). When the evidence of a defendant's guilt is not "overwhelming" and there are conflicts in the evidence of guilt, the error it not harmless. *See id*. at 167-68.

195 A.3d 291 (Pa. Super. 2018) (finding that exclusion of evidence pertaining to victim's credibility, which went to "the core" of the defense, was not harmless).

There is a reasonable probability, then, that Little would have prevailed on this issue in his direct appeal and the PCRA court erred in ruling that Little did not satisfy the three prongs of the subject ineffectiveness claim. The portion of the PCRA court's order denying this claim must be reversed, and to remedy trial counsel's deficient performance as to that related and previously waived appellate issue, Little is granted leave to file a notice of appeal with this Court within 30 days from the date of this opinion. In these prospective proceedings, Little would be permitted to raise this one ground so that its merits may be considered as if it were raised for the first time on direct appeal.

Order reversed in part and affirmed in part. Jurisdiction relinquished. Case remanded for further proceedings consistent with this opinion.

President Judge Panella joins the opinion.

Judge Nichols did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/24/20