J-S08024-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RAMON LUIS RODRIGUEZ | : | |
| | : | |
| Appellant | : | No. 1215 MDA 2023 |

Appeal from the Judgment of Sentence Entered April 24, 2023
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0003367-2019

BEFORE:   OLSON, J., MURRAY, J., and STEVENS, P.J.E.*

MEMORANDUM BY MURRAY, J.:                **FILED: APRIL 9, 2024**

Ramon Luis Rodriguez (Appellant) appeals from the judgment of sentence entered, following a bench trial, for his convictions of persons not to possess, use, manufacture, control sell or transfer firearms; firearms not to be carried without a license; possession of a small amount of marijuana; sun screening and other materials prohibited (window-tint violation);[1] and other summary offenses.  After careful review, we affirm.

> The trial court described the facts underlying the instant appeal:
> On June 14, 2019, Officer Nathan Scott ("Officer Scott") of the Exeter Township Police Department was in uniform and in a marked vehicle parked at Monocacy Hill Road and 422 westbound in Exeter Township.  Notes of Testimony, … January 28, 2022

---

* Former Justice specially assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), 3925(a); 35 P.S. § 780-113(a)(31); 75 Pa.C.S.A. § 4524(e)(1).

("N.T."), at 5-6. At 2:44 a.m., Officer Scott observed a white Buick commit [] traffic violations[, discussed further below,] and initiated [a] traffic stop. *Id.* at 6-7, 21-22. [Appellant, the sole occupant,] was operating the Buick but was not the registered owner. *Id.* at 7, 30.

Prior to Officer Scott approaching the Buick, [Appellant] placed the Buick's keys on top of the roof. *Id.* at 7-8. As he walked towards the vehicle, Officer Scott noticed that there were several air fresheners in the vehicle's vents and a small black plastic bag on the passenger seat that contained cylindrical objects. *Id.* at 8. Based on Officer Scott's prior experience, he recognized these objects as items commonly used to package narcotics, including marijuana. *Id.* at 8-10, 35. He smelled an odor of marijuana coming from the vehicle. *Id.* at 8, 10.

Officer Scott asked [Appellant] for his license, registration[,] and insurance information. *Id.* at 10. In response, [Appellant] stated that he did not have a license and didn't want to cause any trouble. *Id.* **He told Officer Scott that he could search [Appellant's] vehicle.** *Id.* [Appellant] opened the glove box to obtain the requested documentation. *Id.* When he opened the glove box, Officer Scott observed a clear mason jar containing marijuana flakes. *Id.* at 10-11. Officer Scott asked [Appellant] to exit the vehicle. *Id.* at 11. He noticed that [Appellant] had a bulge in his front left pocket and asked him about it. *Id.* [Appellant] stated that it was a "stack," a word commonly used to describe $1,000.00. *Id.* at 11, 32. [Appellant] pulled out the money and showed Officer Scott. *Id.* at 11.

**After Officer Scott saw [Appellant's] money, he asked him for consent to search the vehicle. *Id.* [Appellant] agreed**. *Id.* at 11, 22-23. [Appellant] admitted that there would be some marijuana in the vehicle. *Id.* at 12. Officer Scott searched the Buick with the assistance of Officer Auman.[2] *Id.* at 13-14. During the search, Officer Scott found, among other things, five tubes [containing] marijuana inside the black plastic bag on the passenger seat. *Id.* at 12. Officer Auman discovered a white t-shirt on the right side of the front engine compartment and notified Officer Scott. *Id.* at 14-15, 26. Officer Auman used gloves to unwrap the white t-shirt and discovered [a] black plastic

---

[2] Officer Auman's first name is not provided in the transcript.

bag. *Id.* at 15, 29. The bag was similar to the black plastic bag previously observed by Officer Scott on the vehicle's passenger seat. *Id.* at 15. A handgun was found inside of the plastic bag. *Id.* It was seized and sent to the Pennsylvania State Police laboratory for processing. *Id.* at 16-17, 35.

Trial Court Opinion, 10/17/23, at 1-3 (emphasis and footnote added). Officers arrested Appellant and charged him with the above-described offenses.

When Officer Scott checked, he determined Appellant did not have a license to carry a firearm. Officer Scott discovered that in 2005, Brian Shuffelbottom (Shuffelbottom) had reported the firearm found in the Buick as stolen. Shuffelbottom did not know Appellant, and Appellant did not have Shuffelbottom's permission to possess the firearm.

Pursuant to a search warrant, police obtained a DNA sample from Appellant. DNA from the firearm matched three individuals:

> [Appellant] was unable to be excluded as a potential contributor to the mixture. The DNA profile was 7.5 quadrillion times more likely to have originated from [Appellant] and two unknown individuals than if it had originated from three other unknown individuals. **[Appellant's] DNA profile was a major component of the DNA profile on the gun.**

Trial Court Opinion, 10/17/23, at 4 (emphasis added, citations omitted).

Appellant filed an omnibus pretrial suppression motion on February 3, 2021. On February 8, 2021, the suppression court conducted an evidentiary hearing on Appellant's motion. The court denied the motion on April 7, 2021. Suppression Court Order, 4/7/21.

On January 28, 2022, the matter proceeded to a bench trial. That same day, the trial court convicted Appellant of the above-described offenses. On

April 24, 2023, the trial court sentenced Appellant to an aggregate three and one-half to seven years in prison. With the trial court's permission, Appellant filed a *nunc pro tunc* post-sentence motion on July 17, 2023,[3] which the trial court denied on July 31, 2023. Appellant timely appealed. Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

1. Whether the trial court erred in denying the Appellant's Omnibus Pretrial Motion.

2. Whether the Commonwealth presented sufficient evidence to establish beyond a reasonable doubt the elements for … Person Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearm.

3. Whether the Commonwealth presented sufficient evidence to establish beyond a reasonable doubt the elements for … Receiving Stolen Property.

4. Whether the Commonwealth presented sufficient evidence to establish beyond a reasonable doubt the elements for … Firearms Not to be Carried Without a License.

_____

[3] Appellant (1) filed his petition to file a *nunc pro tunc* post-sentence motion within 30 days of his judgment of sentence; and (2) the trial court granted the petition within 30 days of sentencing. **See Commonwealth v. Capaldi**, 112 A.3d 1242, (Pa. Super. 2015) ("[A] post-sentence motion *nunc pro tunc* may toll the appeal period, but only if two conditions are met. First, within 30 days of imposition of sentence, a defendant must request the trial court to consider a post-sentence motion *nunc pro tunc*. … Second, the trial court must **expressly permit** the filing of a post-sentence motion *nunc pro tunc*, also within 30 days of imposition of sentence." (emphasis in original; citations omitted)). Appellant further complied with the trial court's order requiring his *nunc pro tunc* motion to be filed within 30 days of the date the last of Appellant's requested transcripts is filed. **See** Trial Court Order, 5/23/23. Accordingly, the appeal is properly before us for disposition.

5.  Whether the verdict against Appellant for … Person Not ToPossess, Use, Manufacture, Control, Sell or Transfer Firearms, was against the weight of the evidence.

6.  Whether the verdict against Appellant for … Receiving Stolen Property, was against the weight of the evidence.

7.  Whether the verdict against Appellant for … Firearms Not To Be Carried Without a License, was against the weight of the evidence.

Appellant's Brief at 15-16 (issues reordered; numerical designations added).

## SUPPRESSION

In his first issue, Appellant challenges the denial of his omnibus pretrial suppression motion on several bases, which we address in turn. *Id.* at 47. Appellant initially argues Officer Scott lacked probable cause to stop Appellant's vehicle for a window-tint violation. *Id.* Appellant states Officer Scott initiated the traffic stop at 3:00 a.m. *Id.* at 48. Appellant points out Officer Scott's testimony that his police cruiser was parked perpendicular to Appellant's vehicle; Appellant's vehicle passed Officer Scott's marked police cruiser at about 50-70 miles per hour; and Officer Scott could view Appellant's vehicle only for a few seconds. *Id.* According to Appellant,

> [g]iven the surrounding circumstances, it is unlikely [Officer Scott] could form probable cause [to determine that] the tint on the windshield and/or side windows was too dark to see through and that [Appellant] violated 75 Pa.C.S.A. § 4524(e)(1).

*Id.*

Appellant also challenges Officer Scott's traffic stop for a high-beam headlight violation under 75 Pa.C.S.A. § 4306(a). Appellant's Brief at 49. According to Appellant, Officer Scott was in a stationary vehicle and not driving

toward Appellant. *Id.* Further, Appellant asserts Officer Scott presented no testimony regarding any vehicle approaching Appellant. *Id.* Appellant directs our attention to Officer Scott's concession that Appellant was not required to deactivate his high beams when passing the officer's stationary, perpendicular vehicle. *Id.* Appellant argues, because Officer Scott lacked probable cause for the vehicle stop, the stop was illegal and all evidence found during the subsequent search must be suppressed. *Id.* at 50.

Our review is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa. Super. 2017) (citation omitted). Because the Commonwealth prevailed before the suppression court,

> we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where … the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

*Id.* "[I]t is the sole province of the suppression court to weigh the credibility of witnesses," and "the suppression court judge is entitled to believe all, part or none of the evidence presented." *Commonwealth v. Blasioli*, 685 A.2d

151, 157 (Pa. Super. 1996) (citation omitted). Importantly, our review is limited to the suppression record. *In re L.J*., 79 A.3d 1073, 1085 (Pa. 2013).

The "Fourth Amendment of the Federal Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures." *Commonwealth v. Walls*, 53 A.3d 889, 892 (Pa. Super. 2012). "To secure the right of citizens to be free from [unreasonable] intrusions, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive." *Commonwealth v. Pratt*, 930 A.2d 561, 563 (Pa. Super. 2007). Pennsylvania Courts recognize three types of interactions between police and citizens: a mere encounter, an investigative detention, and a custodial detention. *Commonwealth v. Newsome*, 170 A.3d 1151, 1154 (Pa. Super. 2017).

> A mere encounter between police and a citizen need not be supported by any level of suspicion, and carr[ies] no official compulsion on the part of the citizen to stop or to respond. An investigatory stop, which subjects a suspect to a stop and a period of detention … requires a reasonable suspicion that criminal activity is afoot. A custodial search is an arrest and must be supported by probable cause.

*Id.*

"Probable cause exists where the facts and circumstances within the officers' knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." *Commonwealth*

***v. Luv***, 735 A.2d 87, 90 (Pa. 1999) (citation omitted). "[A] police officer has probable cause to stop a motor vehicle if the officer observes a traffic code violation, even if it is a minor offense." ***Commonwealth v. Harris***, 176 A.3d 1009, 1019 (Pa. Super. 2017).

"Reasonable suspicion is a less stringent standard than probable cause necessary to effectuate a warrantless arrest, and depends on the information possessed by police and its degree of reliability in the totality of the circumstances." ***Newsome***, 170 A.3d at 1154 (citation omitted).

> An appellate court must give weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience and acknowledge that innocent facts, when considered collectively, may permit the investigative detention. We are mindful of the fact that,
>
>> the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

***Id.*** (citations and quotation marks omitted).

In order to establish reasonable suspicion to justify a vehicle stop, "an officer must be able to point to specific and articulable facts which led him to reasonably suspect a violation of the" Vehicle Code; the standard "is an objective one, based on the totality of the circumstances." ***Commonwealth v. Shaw***, 246 A.3d 879, 883 (Pa. Super. 2021) (citations omitted).

The Motor Vehicle Code provides that,

> [w]henever a police officer ... has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a

vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S.A. § 6308(b).  An *en banc* panel of this Court explained,

[t]raffic stops based on a reasonable suspicion[,] either of criminal activity or a violation of the Motor Vehicle Code under the authority of Section 6308(b)[,] must serve a stated investigatory purpose.  In effect, the language of Section 6308(b) — to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title — is conceptually equivalent with the underlying purpose of a **Terry**[4] stop.

Mere reasonable suspicion will not justify a vehicle stop when the driver's detention cannot serve an investigatory purpose relevant to the suspected violation.  In such an instance, it is [i]ncumbent upon the officer to articulate specific facts possessed by him, at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in violation of some provision of the Code.

**Commonwealth v. Feczko**, 10 A.3d 1285, 1291 (Pa. Super. 2010) (*en banc*) (footnote added; citations, quotation marks, and emphasis omitted).  **Cf.**

**Commonwealth v. Chase**, 960 A.2d 108, 116 (Pa. 2008) (stating that to conduct a non-investigative stop for a violation of the Motor Vehicle Code, a police officer must have probable cause to believe an offense has occurred).

Here, Officer Scott stopped Appellant's vehicle for a suspected window-tint violation.  Section 4524(e)(1) provides as follows:

No person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or

---

[4] **See Terry v. Ohio**, 392 U.S. 1 (1967).

view the inside of the vehicle through the windshield, side wing or side window of the vehicle.

75 Pa.C.S.A. § 4524(e)(1).

In **Commonwealth v. Prizzia**, 260 A.3d 263 (Pa. Super. 2021), this Court addressed the cause necessary for a traffic stop for a window-tint violation:

[I]n our view, **the appropriate quantum of cause necessary to validate a traffic stop based on a violation of section 4524(e)(1) is dependent on the specific facts of each case.** In some situations, ... a probable cause standard will apply because the officer's testimony establishes that a window-tint violation was immediately apparent to the officer, and no further investigatory purpose was served by the traffic stop. In other cases ..., a reasonable suspicion standard could apply because the officer's testimony demonstrates that he or she stopped the vehicle to get a closer and/or unobstructed view of the windows, in further investigation of whether the tint violates section 4524(e)(1). Accordingly, **our decision today should not be read as precluding application of a reasonable suspicion standard to a stop for a window-tint violation, if the specific facts of the case demonstrate that an investigatory purpose was served by the stop.**

**Prizzia**, 260 A.3d at 269 n.2 (emphasis added).

In **Prizzia**, this Court determined that the circumstances required the officer to have probable cause to stop the vehicle:

While on patrol, [Pennsylvania State Trooper Anthony Spegar] observed a vehicle on the road with windows tinted to the degree that [he] could not see the operator inside the vehicle. Trooper Spegar testified that prior to initiating a traffic stop, he followed [the appellant's] white Scion TC for a period of time and at no distance could he see through the side, front, [or] passenger windows. Trooper Spegar further testified that in his experience as a Pennsylvania State Trooper, he is aware that at the distances from which he observed [the appellant's] vehicle prior to conducting a traffic stop, manufacturer-installed tint would not

- 10 -

render the windows too dark to see through. Based on his observations, Trooper Spegar conducted a traffic stop of [the appellant's] vehicle based on illegal window tint.

*Prizzia*, 260 A.3d at 265 (citations and quotation marks omitted). Applying a probable cause standard, we agreed Trooper Spegar had probable cause to stop the appellant's vehicle:

> Trooper Spegar testified that the windows on [the appellant's] vehicle were so darkly tinted that he could not see inside. This testimony was corroborated by still photographs entered into evidence at the suppression hearing, which showed that "at certain angles, the side panel windows on [appellant's] car [were], indeed, darkly tinted to a degree that seeing through [the] same [was] difficult, if not impossible." Trooper Spegar's testimony, and the corroborating evidence, demonstrated that the trooper could not see through [the appellant's] windows, thus establishing probable cause to stop her vehicle for a violation of section 4524(e)(1).

*Id.* at 269-70 (citations omitted).

By contrast, in *Commonwealth v. Green*, 298 A.3d 1158 (Pa. Super. 2023) (unpublished memorandum),[5]

> the circumstances warranted application of a reasonable suspicion standard. At the suppression hearing, [Pennsylvania State] Trooper [Matthew] Shiner testified that at 9:50 a.m. on March 4, 2020, he parked his vehicle at a crossover to observe southbound traffic on Interstate 279. Trooper Shiner parked perpendicular to the interstate, with the front of the police vehicle "facing the two lanes of traffic[.]" As [a]ppellant's Chevrolet Impala drove past, Trooper Shiner observed the vehicle's front windshield, driver's window[,] and left passenger window. According to Trooper Shiner,

_____

[5] *See* Pa.R.A.P. 126(b) (providing unpublished non-precedential memorandum decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

- 11 -

> [a]s the vehicle passed my location, I observed the vehicle to have not [*sic*] factory window tint dark enough where I was unable to see any occupants within the vehicle as it passed my location.
>
> Unlike the trooper in *Prizzia*, Trooper Shiner did not follow the vehicle for further investigation prior to the traffic stop.
>
> … Trooper Shiner's traffic stop served a valid investigatory purpose. Trooper Shiner testified:
>
> > As I approached the vehicle, I was still able to ascertain that the window tint was still dark enough I was unable to observe anybody inside, at which point [appellant] did roll down his driver's side window at which time I engaged him in conversation.

*Id.* (unpublished memorandum at 7-8) (citations and emphasis omitted).

Here, at the suppression hearing, the Commonwealth presented the testimony of Officer Scott. N.T., 2/8/21, at 4. Officer Scott testified that on July 14, 2019, at about 2:44 a.m., he parked his marked patrol vehicle in the area of Monocacy Hill Road and State Route 422. *Id.* at 6. He stated, "I was stationary, so if I was looking at 422, I was like a T and I was visible. I always park my car visible to oncoming traffic." *Id.* 6-7. At around 2:44 a.m., Officer Scott observed

> a Buick sedan, at the time I believe it was like white or cream color with heavy tinted windows[,] pass[] my location. Also[,] when they approached and passed my location, they still had their high beams on.

*Id.* at 7. According to the officer, "there is one streetlight there at that location as well as a residential house at that location that had lights outside." *Id.* When the Buick passed by Officer Scott's location, he could not see into

- 12 -

the vehicle's windows, with the aid of the street light or his police unit's front running lights. *Id.* Regarding the window tint, Officer Scott explained that when Appellant drove past him, he could see tint on the two driver's side windows. *Id.* at 37.

Officer Scott pulled his police cruiser out from its parking spot and, after the following Appellant for less than a mile, Officer Scott effected a traffic stop. *Id.* at 7, 9, 30. Before Officer Scott exited his police cruiser, "the driver of the vehicle at the time rolled down his window and placed his keys, which is unusual, on top of the roof of the white or tan Buick." *Id.* Officer Scott then approached the passenger side of the Buick. *Id.* As he approached Appellant's vehicle,

> the back rear windshield was so dark I couldn't even see through. Also, the … rear passenger window was so dark I couldn't see through.

*Id.* at 36-37.

Instantly, as in *Green*, our review confirms Officer Scott's vehicle stop served a valid investigatory purpose relevant to Appellant's suspected window-tint violation. *See Green*, 285 A.3d 907, 2022 Pa. Super. Unpub. LEXIS 2091, *10-11 (unpublished memorandum at 8). Accordingly, we conclude Officer Scott's traffic stop required reasonable suspicion of a Vehicle Code violation. *Shaw*, 246 A.3d 879, 883.

Applying the reasonable suspicion standard, Officer Scott testified that he observed a Buick pass his patrol vehicle with heavily tinted windows on the

driver's side. N.T., 2/8/21, at 7, 37. Officer Scott could not see through the windows. *Id.* at 37. Thus, Officer Scott's traffic stop was supported by reasonable suspicion of a window-tint violation. *See Green*, *supra.* Appellant's challenge to the initial traffic stop, based upon a lack of *probable cause*, warrants no relief.[6]

Appellant next argues "the search of the vehicle was improper due to the invalidity of the consent." Appellant's Brief at 50 (capitalization modified). Appellant claims Officer Scott "did not conduct the search during a legal police interaction." *Id.* Appellant concedes he

> gave consent to search the car but then, after Officer Scott told [Appellant] he'd seen marijuana residue, [Appellant] asked if he could get the marijuana out himself. This was an express action that, to a reasonable fact finder, may constitute the withdrawal of consent….

*Id.* at 51. Appellant asserts, "While Officer Scott testified he told [Appellant] he did not have to consent to the search, that was not in the police report." *Id.* Appellant additionally points to Officer Scott's inquiry about the money in Appellant's pocket prior to his consent to search. *Id.* Appellant claims, considering the circumstances, his consent was invalid. *Id.* at 52.

We observe,

> [b]oth the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals, their homes, their papers, and their effects and

---

[6] As we conclude the traffic stop was supported by reasonable suspicion of a window-tint violation, we need not address whether Officer Scott had probable cause to stop Appellant's vehicle for a high-beam violation.

possessions from unreasonable searches and seizures. For a search to be lawful, police must first obtain a warrant, supported by probable cause, from a neutral and detached magistrate. A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies.

One of the limited exceptions to the warrant requirement is a consensual search. [W]e have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so. Although a warrantless, but consensual, search is constitutionally permissible, obtaining consent is an investigative tool utilized by law enforcement. It allows police to do what otherwise would be impermissible without a warrant. As a consent search is in derogation of the Fourth Amendment, there are carefully demarked limitations as to what constitutes a valid consent search.

First, consent must be voluntarily given during a lawful police interaction. For a finding of voluntariness, the Commonwealth must establish that the consent given by the defendant is the product of an essentially free and unconstrained choice — not the result of duress or coercion, express or implied, or a will overborne — under the totality of the circumstances.

If consent is given voluntarily, the ensuing search must be conducted within the scope of that consent. The standard for measuring the scope of an individual's consent is one of objective reasonableness. We do not ascertain the scope of consent from the individual's subjective belief or the officer's understanding based on his or her training and experience, but based on what ... the typical reasonable person would have understood by the exchange between the officer and the suspect.

***Commonwealth v. Valdivia***, 195 A.3d 855, 861-62 (Pa. 2018) (citations, footnotes, and quotation marks omitted).

Officer Scott testified at the suppression hearing that he had over 260 hours of criminal interdiction training. N.T., 2/8/21, at 5. Officer Scott explained he (a) was "one of the first guys to attend" the Pennsylvania State

Police Safe Highways Initiative Through Effective Law Enforcement and Detection (SHIELD)] Program; (b) has taken "various search and seizure classes, drug identification classes"; and (c) "served with the Berks County Narcotics Task Force since 2017." *Id.* Officer Scott stated he received training, through the SHIELD and Desert Snow[7] programs, about the

> criminal element of traffic stops, different behaviors that are present during those traffic stops that individuals inside that vehicle will present to you. How people in criminal activity will conceal … contraband, anything from large amounts of money to illegal firearms to narcotics, retail theft organizations, also sex trafficking, anything that's criminal.

*Id.*

Officer Scott testified that, upon stopping Appellant's vehicle, he observed that Appellant was on

> one of his phones that he had because I observed multiple phones. But he was, I believe, Face[-]Timing or Skyping or chatting with a female on his phone.
>
> ….
>
> On the passenger seat on top there was a corner-store bag …, it's a small, plastic, midsized plastic bag that was knotted and pretty tight, and inside that I could make out that there was a tube cylinder containers [*sic*] inside there. Also around the vents on the front dash area were several air fresheners. [Officer Scott] also noticed an odor of marijuana coming from inside the vehicle.

N.T., 2/8/21, at 10-11. Officer Scott explained,

---

[7] "Desert Snow is the most requested and longest running criminal interdiction training program in North America." https://www.desertsnow.com/ (last accessed March 21, 2024).

from previous arrests, people would contain or conceal illegal narcotics and contraband inside those cylinders, **but at that moment in time I wasn't sure if there was anything illegal inside those tubes.**

*Id.* at 12 (emphasis added).

Officer Scott described what next transpired:

I asked [Appellant] for his license, registration, insurance. At that moment he stated that he did not have his license[8] and also stated that he was just trying to get to this girl's house … in Reading, and he didn't want no problem **and I could search the vehicle if I wanted to.**

….

… [Appellant] reached over to his glove box and I believe was looking for his registration and insurance paperwork. … [W]hen he opened it up, I observed a small mason jar, clear glass, and inside of it a small amount of shake, which is commonly referred to as marijuana.

*Id.* at 14 (emphasis and footnote added). Around the time Officer Scott observed the mason jar, his supervisor, a police sergeant, arrived at the scene. *Id.* at 38. The sergeant pulled his marked police cruiser directly behind Officer Scott's vehicle. *Id.* at 15.

---

[8] Officer Scott later confirmed,

initially [Appellant] told me from the beginning of the stop that his license was suspended, but at that time, … I advised him that I wasn't going to tow the vehicle ….

N.T., 2/8/21, at 41.

- 17 -

Officer Scott asked Appellant to walk to the front of Officer Scott's vehicle. *Id.* at 16-17. As they walked, Officer Scott advised Appellant that Appellant could not drive the Buick, as he had no license, but police would not tow the vehicle. *Id.* at 16, 41-42. Additionally, while standing next to Appellant's vehicle, Officer Scott had observed

> a large bulge … in [Appellant's] left or right front pocket. I believe he was wearing jeans at the time. So when [Appellant] stepped out [of the vehicle,] I asked him what it was. He had a stack, which is commonly referred to as United States money, and also a thousand, specifically.

*Id.* at 15. Officer Scott testified,

> [Appellant] was facing his vehicle in front of my vehicle in between his Buick and my police vehicle, and then at that moment in time I asked him again if I could search his vehicle.

*Id.* at 16. Appellant again consented to a search. *Id.* at 17.

Officer Scott told Appellant that he had observed what appeared to be marijuana on the Buick's driver's side floor. *Id.* at 43. Appellant asked whether he could retrieve the marijuana, but Officer Scott denied the request. *Id.* At that time, Officer Scott advised Appellant that he was not required to consent to the vehicle search. *Id.* at 44.

Officer Scott described what next transpired:

> I had [Appellant] stand with my supervisor in front of my police vehicle[9] and I began to search the vehicle. [On the driver's side, Officer Scott observed] on a key fob on [Appellant's] keys there was a small metal cylinder tube, which in my past experience and

---

[9] According to Officer Scott, he and two other uniformed officers were at the scene. N.T., 2/8/21, at 38.

- 18 -

past arrests, people usually have them to conceal small amounts of illegal narcotics … or also people with pills will have them, whether they are prescribed or not, they will put them in there as well.  I started to open that up and found four white circle pills inside of it.

….

[Inside t]he glove box was the small glass mason jar with a little bit of marijuana shake inside.

Inside the center console there was one or two tube cylinders, one of them had I believe marijuana inside.  Also, there was another tube cylinder in there that at that time I believe was alleged codeine, which is a controlled substance.

And then also in the black bag on the passenger seat was five or six cylinder tubes, two or three of them had marijuana and two or three of them had at that time I believed alleged codeine.

*Id.* at 19-20 (footnote added).  Officer Scott testified he identified the pills by means of the application, "Pill Finder."  *Id.* at 19.  Officer Scott also found codeine in liquid form.  *Id.* at 20.

Officer Scott continued:

And then also continuing to search the vehicle rear passenger floor there was another black plastic bag.  Inside that bag there were four new cell phones, brand new with cell phone numbers written on the outside of the boxes, Tracfones, disposable phones.  Also, there was two flip phones inside that same bag, again, Tracfones or GoPhones.

… [I]n the rear trunk area I recovered a Narcan nasal spray, 1.4 milligrams of nasal spray back there unused.

*Id.* at 20.

From under the Buick's hood, Officer Scott retrieved "a white T-shirt on top of the front left compartment bay area, which would be the fuse box or air filter." *Id.* at 21.  As described by Officer Scott,

> [t]here was a white T-shirt wrapped around it on that most outer layer, and then inside that was, again, black plastic bag consistent to the other two plastic bags that were inside the vehicle.  And then once that bag was opened up, we recovered a 1911 [.]45 handgun with wooden grips, and the whole gun was mainly chrome ….

*Id.*[10]  Upon inquiry, Officer Scott discovered the gun was reported stolen in 2005.  *Id.* at 21-22, 27.  Appellant was legally prohibited from possessing a firearm, and had no license for the firearm.  *Id.* at 22.

Officer Scott then placed Appellant under arrest and advised Appellant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  N.T., 2/8/21, at 22.  After being advised of his rights, Appellant admitted to owning the "weed and other stuff inside the vehicle[.]" *Id.*  Appellant claimed he did not know about the existence of the handgun found under the hood.  *Id.* at 22-23.

As stated above, the vehicle search resulted from a lawful traffic stop. *See Valdivia*, 195 A.3d at 861-62 (requiring that consent be given during a lawful police interaction).

---

[10] Officer Scott testified that another officer, Officer Auman, discovered the firearm.  *Id.* at 23.  Officer Auman arrived around five minutes after Officer Scott stopped Appellant's vehicle.  *See id.* at 38.

The evidence further established that Appellant consented to a search of his vehicle immediately upon being asked for his license, insurance, and registration. N.T., 2/8/21, at 14. The suppression court found that Appellant "told Officer Scott that he could search the Buick" before being asked to exit his vehicle or being questioned about marijuana or the bulges in Appellant's pockets. Suppression Court Opinion, 4/7/21, at 3 (Findings of Fact, ¶ 10). As detailed above, this finding is supported by the evidence of record. The suppression court correctly observed that Appellant's "consent to search eliminated the need for the Commonwealth to establish exigent circumstances prior to searching the Buick." *Id.* at 10. Further, the record confirms no other officers were present when Appellant initially consented, and there were no coercive conditions causing Appellant's initial and subsequent consent. Under these circumstances, we agree Appellant validly consented to Officer Scott's vehicle search. *See Valdivia*, 195 A.3d at 861-62.

Also in his first issue, Appellant challenges the "scope" of his consent for the vehicle search. Appellant's Brief at 52. Appellant concedes he did not raise this issue before the suppression court. *Id.* However, he asserts that he preserved it in his post-sentence motion for reconsideration. *Id.*

As this Court has explained, "appellate review of an order denying suppression is limited to examination of **the precise basis** under which suppression initially was sought; no new theories of relief may be considered on appeal." *Commonwealth v. Little*, 903 A.2d 1269, 1272-73

(Pa. Super. 2006) (emphasis added). As Appellant did not present this claim to the suppression court, it is waived. *See id.* Appellant's first issue, challenging denial of his suppression motion, merits no relief.

## SUFFICIENCY OF THE EVIDENCE

In his second issue, Appellant challenges the sufficiency of the evidence underlying his conviction of persons not to possess firearms. Appellant's Brief at 24, 29, 33. Appellant concedes that at trial, he stipulated to his prior conviction of "an enumerated offense that prohibits him from possessing a firearm."[11] *Id.* at 25. Appellant claims the Commonwealth failed to prove he actually or constructively possessed the firearm. *Id.* at 26. Appellant asserts a police officer found the handgun "in the front engine compartment of the vehicle [Appellant] was driving." *Id.* Appellant asserts officers found no accessories for firearms in the car or on his person. *Id.* at 27. According to Appellant,

> [t]he handgun was not accessible to [Appellant] at any point of the events on June 14, 2019. Instead, it was in a plastic bag wrapped in a T-shirt in the vehicle's engine compartment. Additionally, it was clear the vehicle did not belong to [Appellant] and the Commonwealth presented no evidence that it had even spoken to the vehicle owner to further investigate….

*Id.* at 26-27. Appellant claims the absence of the vehicle owner's testimony "should not mean the certainty of possession by" Appellant. *Id.* at 27.

_____

[11] Appellant stipulated to a prior conviction of possession with intent to deliver controlled substances, 35 P.S. § 780-113(a)(30), an enumerated offense under 18 Pa.C.S.A. § 6105(c)(2).

- 22 -

Appellant acknowledges the presence of a DNA mixture on the firearm. *Id.* He observes, "[t]he partial DNA profile that was obtained … was consistent with [the] mixture of three individuals, and [Appellant] could not be excluded as a potential contributor." *Id.* Notwithstanding, Appellant directs our attention to testimony from the Commonwealth's DNA expert that,

> while [the expert] could not testify with certainty as to whether the touch sample she analyzed was from primary or secondary transfer, it is the Commonwealth's burden to prove, beyond a reasonable doubt, the DNA wasn't deposited on the firearm by secondary transfer….

*Id.* at 27-28. Without citation, Appellant claims,

> it was clear from the photograph of the evidence taken by police that they were not careful with regard to possible contamination or secondary transfer between items that were collected from [Appellant] and the firearm….

*Id.* at 28. Appellant further points out the lack of evidence regarding how police handled the seized items during their investigation. *Id.*

Our Supreme Court has stated,

> When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt. It [is] incumbent upon the Superior Court to consider all of the evidence introduced at the time of trial, and apparently believed by the fact finder, including the expert's testimony. In applying this standard, … the Commonwealth may sustain its burden by means of wholly circumstantial evidence … and the trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence.

*Commonwealth v. Ratsamy*, 934 A.2d 1233, 1237 (Pa. 2007) (citations omitted). "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Johnson*, 236 A.3d 1141, 1152 (Pa. Super. 2020) (citations omitted).

> Crimes Code Section 6105 provides, in part, as follows:
>
> A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

18 Pa.C.S.A. § 6105(a)(1). Appellant conceded his prior conviction of an enumerated offense. Appellant's Brief at 25.

"When contraband is not found on the defendant's person, the Commonwealth must establish constructive possession...." *Commonwealth v. Jones*, 874 A.2d 108, 121 (Pa. Super. 2005) (citation omitted).

> Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as conscious dominion. We subsequently defined conscious dominion as the power to control the contraband and the intent to exercise that control….

*Commonwealth v. Kinard*, 95 A.3d 279, 292 (Pa. Super. 2014) (citation omitted).

> [A]s with any other element of a crime, constructive possession may be proven by circumstantial evidence. In other words, the Commonwealth must establish facts from which the trier of fact can reasonably infer that the defendant exercised dominion and control over the contraband at issue.

***Commonwealth v. Parrish***, 191 A.3d 31, 36-37 (Pa. Super. 2018) (internal

citations and quotation marks omitted).

Instantly, the Commonwealth's evidence established Appellant was the

driver and only occupant of the Buick.  N.T., 1/28/22, at 6-8.  At trial, Officer

Scott testified he has been a police officer for 10 years.  ***Id.*** at 9-10.  Pursuant

to a lawful traffic stop, Officer Scott observed several items of interest inside

the vehicle, which were several air fresh[en]ers shoved around different vents.

There was a black … small plastic bag on the passenger seat, and inside that

bag it appeared to be cylinder objects."  ***Id.*** at 8.  Officer Scott testified he

had previously seen similar black bags during his prior employment as a

Philadelphia police officer.  ***Id.***  According to Officer Scott, "those black bags

were commonly used at the corner stores when they would sell items."  ***Id.***

> Officer Scott described why those bags were of interest:
>
> When I noticed them -- my background with the Berks County
> Narcotics Task Force since 2017, also employed with Philadelphia
> Housing Authority, so I guess you say my specialty or interest is
> narcotics, so … that drew my interest to them.
>
> ….
>
> They usually are used to package narcotics.  The bigger ones are
> usually marijuana.

***Id.*** at 8-9.  Officer Scott explained,

> I have over 300 hours of drug-related training as far as drug
> recognition, drug interdiction, traffic stops, electronic
> compartments inside motor vehicles, natural compartments that
> are inside vehicles.  I have been to the [SHIELD] training.  Forty

hours had been at a natural interdiction conference. So … I would like to say I have a good knowledge of narcotics.

*Id.* at 9. Officer Scott further noticed an odor of marijuana coming from Appellant's vehicle. *Id.* at 10.

Officer Scott asked for Appellant's driver's license, registration, and proof of insurance. *Id.* at 10. Appellant responded he did not have a license, did not want to cause trouble, and that if Officer Scott "wanted to search his car, I could search his car at that moment." *Id.*

During the search, Officer Auman, assisting Officer Scott, searched the Buick's engine compartment. *Id.* at 14. At Officer Auman's direction, Officer Scott observed a white towel on the right driver side of the engine compartment. *Id.* Inside the white towel,

> there was a white T-shirt. Once [Officer Auman] unwrapped the T-shirt, there was a black plastic bag. One that was consistent like the one found in the vehicle on the passenger side area. Inside that, there was a model 1911 A1 handgun. It was a silver handgun with brown wood grain grips.

*Id.* at 15. There was no ammunition inside of the handgun. *Id.* at 17. Officer Scott

> walked back to where [Appellant] was standing, put handcuffs on him, then placed him in the rear of my police car. I also read him his *Miranda* Warnings and explained to him that he did not have to talk to me. I asked him if he understood English. He said he did, and then I asked him a couple questions.
>
> ….
>
> [Appellant] stated that the marijuana and the other narcotics and stuff inside the vehicle were his, but he did not know about the gun, and the gun was not his.

- 26 -

*Id.* When he ran a computer check, Officer Scott found Appellant did not have a license to carry a firearm. *Id.* at 19.

Pursuant to a subsequent search warrant, Officer Scott collected for testing a DNA sample from Appellant. *Id.* at 34. Officer Scott also sent the suspected controlled substance for testing, which confirmed it was marijuana. *Id.* at 20.

The Commonwealth also presented the expert testimony of Samantha Newhart. *Id.* at 38. Ms. Newhart testified she is employed by the Commonwealth of Pennsylvania as a forensic DNA scientist. *Id.* Appellant stipulated to Ms. Newhart's expert qualifications to testify about DNA analysis and comparison. *Id.*

Ms. Newhart testified she received two swabs from the seized firearm. *Id.* at 42. According to Ms. Newhart, "[f]rom that piece of evidence I obtained a DNA profile that is consistent with at least three individuals from swabs of the gun, and it was just one mixture of three people." *Id.* She explained,

> I concluded that a partial DNA profile, consistent with three individuals, was obtained from the swabs of the gun, … and [Appellant] … cannot be excluded as a potential contributor to this mixture.
>
> The DNA profile obtained from this item is 7.5 quadrillion times more likely if it originated from [Appellant] … and two unknown individuals than if it had originated from three other unknown individuals.

*Id.* Ms. Newhart testified to a reasonable degree of scientific certainty. *Id.* at 44.

- 27 -

On cross-examination, Ms. Newhart explained that the laboratory takes precautions to prevent cross-contamination of tested samples. *Id.* at 49. Ms. Newhart was shown a police photo of the firearm next to other seized items. *Id.* at 51; *see* Defendant's Exhibit 3. When asked about quality control issues with the tested samples, Ms. Newhart testified,

> [i]t's very unlikely DNA would go from … porous to a non-porous item. It's more likely that a porous item will absorb DNA from a non-porous item. Also, usually, friction should be applied when DNA is left. It does not always just show up. But based on the scenario, I would be cautious.

*Id.* at 51-52. Ms. Newhart testified, "I cannot say with confidence whether it is a primary or secondary transfer and how much friction was applied to that profile." *Id.* at 53.

Brian Shuffelbottom testified that he discovered his firearm was missing in 2005 and reported it as stolen at that time. *Id.* at 54. According to Mr. Shuffelbottom, the firearm seized from the Buick is the same firearm he reported as stolen. *Id.* at 54. Mr. Shuffelbottom denied knowing Appellant. *Id.* at 55.

Appellant did not testify at trial. *Id.* Appellant stipulated to his prior conviction of possession with intent to deliver controlled substances,[12] an enumerated offense under 18 Pa.C.S.A. § 6105(c)(2). Appellant further

---

[12] *See* 35 P.S. § 780-113(a)(30).

stipulated the substance seized from the Buick tested positive for marijuana. *Id.* at 57.

Under the totality of these circumstances, the Commonwealth demonstrated Appellant's conscious control or dominion over the firearm. As the trial court explained,

> [t]he firearm was discovered in the front engine compartment of the vehicle operated by [Appellant]. It was inside of a black plastic bag similar to the plastic bag Officer Scott observed on the front passenger seat that contained drugs owned by [Appellant]. Additionally, [Appellant's] DNA profile was a major component of the DNA located on the firearm. The evidence established that it was 7.5 quadrillion times more likely that the DNA on the gun originated from [Appellant] and two unknown individuals than if it had originated from three other unknown individuals. [Appellant] also stipulated to his prior convictions from 2014 for Manufacture, Delivery or Possession with Intent to Manufacture or Delivery of a Controlled Substance. These offenses may be punishable by a term of imprisonment exceeding two years. Therefore, when evaluating the evidence in the light most favorable to the Commonwealth as the verdict winner, the evidence was sufficient to establish that [Appellant] possessed a firearm while prohibited from doing so. He is not entitled to relief.

Trial Court Opinion, 10/17/23, at 7 (footnote omitted). We agree. When viewed in their totality, the trial court's findings are supported in the record, and we discern no legal error. *See id.* Appellant's second issue merits no relief.

In his third issue, Appellant challenges the sufficiency of the evidence underlying his conviction of carrying a firearm without a license. Appellant argues that in *Commonwealth v. Boatwright*, 453 A.2d 1058 (Pa. Super. 1982), this Court concluded the Commonwealth had failed to establish

constructive possession of a firearm found on the left rear floor of an automobile.[13] Appellant's Brief at 36. According to Appellant, the **Boatwright** panel concluded the Commonwealth failed to establish the defendant's joint constructive possession of the firearm, or that the defendant "had the power to control the firearm and the intent to exercise the control." *Id.*

Appellant argues that the Commonwealth failed to present sufficient evidence that he knowingly, intentionally, or recklessly possessed the firearm. *Id.* Appellant alleges he was driving someone else's vehicle; he borrowed the vehicle to see his girlfriend; and he denied knowing of the firearm's presence in the vehicle. *Id.* at 36-37. Appellant further claims the DNA evidence did not preclude the secondary transfer of his DNA onto the firearm. *Id.* at 37. Appellant argues there is no evidence of his intent to exercise control over the firearm, as it was found in an inaccessible area of the Buick. *Id.* Finally, Appellant claims police found no other items related to the firearm, such as a holster and bullets. *Id.* at 38.

Section 6106 provides in relevant part:

(a) Offense defined.--

---

[13] Appellant also relies on this Court's decision in **Commonwealth v. Wiley**, 175 A.3d 1073 (Pa. Super. 2017) (unpublished memorandum). However, only unpublished memoranda filed after May 1, 2019, may be cited for their persuasive value. Pa.R.A.P. 126(b)(2). As **Wiley** was filed before this date, we do not consider it. *See id.*

> (1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S.A. § 6106(a)(1).

In ***Boatwright***,

> [t]he Commonwealth's evidence disclosed that, shortly after 10:00 p.m. on April 10, 1979, Officers Charles Roller and Annette Roebuck responded to a radio call concerning three "suspicious" men in an automobile parked in front of a residence in the Hazelwood section of Pittsburgh. Upon arriving at the location, Officer Roller observed [Boatwright], who was seated in the front passenger seat of the vehicle, "moving towards his left rear." The officer could not see [Boatwright's] hand or arm, only a movement of his body. Officer Roller then opened the door of the automobile and asked [Boatwright] to get out. He shined a light onto the left rear floor of the vehicle and saw a gun. In addition to [Boatwright], the car was occupied by the driver and another passenger who was seated in the left rear seat. The car was registered to the driver's girlfriend and the gun to one Darlene Simpson.

*Id.* at 1058-59. The ***Boatwright*** panel concluded these facts failed to demonstrate Boatwright's **joint** constructive possession of the firearm, as

> [t]he only evidence other than mere presence was Officer Roller's testimony that [Boatwright] made a movement toward the left rear of the vehicle. This evidence cannot provide proof beyond a reasonable doubt that [Boatwright] possessed the firearm in question. Therefore, the conviction cannot be sustained.

*Id.* at 1059.

Here, unlike in ***Boatwright***, the Commonwealth presented evidence Appellant was the only occupant of the Buick. N.T., 1/28/22, at 7. Further, Appellant's DNA was found on the firearm, and it was packaged in a bag

- 31 -

consistent with the bags police found near Appellant inside the Buick. *Id.* at 15, 42. Thus, *Boatwright* is distinguishable on these facts.

Furthermore, based on the evidence presented, the trial court rejected Appellant's claim:

> In this case, the evidence was sufficient to support [Appellant's] conviction for firearms not to be carried without a license. The Commonwealth established that [Appellant] carried the firearm in the Buick when he wrapped it in a plastic bag and a t-shirt before concealing it in the front engine compartment. His DNA was on the gun and the bag he used to conceal the firearm was similar to the bag containing his drugs. He was not in his place of abode or place of business while in possession of the firearm. Lastly, the Commonwealth proved that [Appellant] did not have a license to carry the gun[]. Therefore, when evaluating the evidence in the light most favorable to the Commonwealth as the verdict winner, the evidence was sufficient to establish that [Appellant] committed the offense of firearms not to be carried without a license.

Trial Court Opinion, 10/17/23, at 10. We agree with the trial court's sound reasoning and conclusion, stated above, and affirm on this basis with regard to Appellant's third issue. *See id.*

In his fourth issue, Appellant challenges the sufficiency of the evidence underlying his conviction of receiving stolen property. Appellant's Brief at 29. Appellant claims the Commonwealth failed to establish Appellant knew of the firearm's presence in the Buick, or that he had intentionally acquired the firearm. *Id.* at 32. In support, Appellant points out his consent to the search of the Buick, and waiver of his *Miranda* rights. *Id.* Further, Appellant asserts, the vehicle was not registered to him. *Id.*

Appellant argues the Commonwealth failed to prove *mens rea*, in that there is no "recency" between the date the firearm was stolen and the date of his possession. *Id.* at 32-33. Appellant asserts he was 13 years old in 2005, when the firearm was stolen. *Id.* at 33. Under these circumstances, Appellant claims the Commonwealth failed to prove he intentionally acquired or had knowledge of the stolen firearm in the Buick. *Id.*

The Crimes Code defines the crime of receiving stolen property as follows:

> **(a)** *Offense defined.* — A person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner.
>
> **(b)** *Definition.* — As used in this section the word "receiving" means acquiring possession, control or title, or lending on the security of the property.

18 Pa.C.S.A. § 3925.

This Court has recognized,

> [g]uilty knowledge (like all culpable mental states) may be proved by circumstantial evidence. *See* [*Commonwealth v.*] *Pruitt*, 951 A.2d 307, 314 [(Pa. 2008)]. "Often, intent cannot be proven directly but must be inferred from examination of the facts and circumstances of the case." *Commonwealth v. Pond*, 846 A.2d 699, 707 (Pa. Super. 2004) (citation omitted). "When examining the totality of the circumstances to determine if there is sufficient evidence from which a jury could infer the requisite *mens rea*, we must, as with any sufficiency analysis, examine all record evidence and all reasonable inferences therefrom." *Id.* (citation and internal quotation marks omitted). In conducting our assessment, we stress again that we must view the evidence in the light most favorable to the Commonwealth as the verdict winner. *Pruitt*, 951 A.2d at 313.

> The trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence. ***Commonwealth v. Watkins***, 577 Pa. 194, 843 A.2d 1203, 1211 (Pa. 2003).

***Commonwealth v. Newhart***, 994 A.2d 1127, 1132 (Pa. Super. 2010).

> Instantly, the trial court rejected Appellant's sufficiency challenge:

> As set forth above, [Appellant] was found to be in the possession of a firearm owned by Shuffelbottom. [Appellant] hid the firearm inside of the front engine compartment and took the additional steps of wrapping it in both a plastic bag and t-shirt to further conceal the weapon. Clearly, [Appellant's] actions were consistent with his knowledge that this firearm was illegal contraband and took steps to hide it. His DNA was on the gun and the bag he used to conceal the firearm was similar to the bag containing his drugs. Also, [Appellant] was a person prohibited from legally obtaining a firearm and would have needed to turn to illegitimate means to acquire a firearm. Therefore, when evaluating the evidence in the light most favorable to the Commonwealth as the verdict winner, the evidence was sufficient to establish that [Appellant] committed the offense of receiving stolen property. He is not entitled to relief.

Trial Court Opinion, 10/17/23, at 9; ***see also***, ***e.g.***, ***Commonwealth v. Hudson***, 955 A.2d 1031, 1036-37 (Pa. Super. 2008) (holding that a defendant's flight from police or concealment may be "admissible as evidence of consciousness of guilt."). The trial court's findings are supported in the record and we discern no error in its analysis and conclusion. ***See*** Trial Court Opinion, 10/17/23, at 9. We therefore affirm on the basis of the trial court's above-stated rationale as to this issue. ***See id.***

## WEIGHT OF THE EVIDENCE

- 34 -

Appellant's remaining three issues challenge the verdicts as against the weight of the evidence.[14]  We address Appellant's weight challenges together.

In his fifth issue, Appellant contends his conviction of person not to possess firearms was contrary to the weight of the evidence.  Appellant's Brief at 38.  Appellant claims the trial court "did not give proper weight to parts of the testimony."  *Id.* at 39.  In particular, Appellant challenges the weight the court afforded to Ms. Newhart's testimony regarding whether the seized items, photographed together at the police station "could cause enough friction to transfer DNA to create a partial sample such as the one they collected."  *Id.* at 39.  According to Appellant, Ms. Newhart could not give a definitive "yes" or "no" answer, and expressed caution about "quality control."  *Id.*

Appellant asserts Ms. Newhart acknowledged the sample was "not a high-quality sample, which means it was a touch sample."  *Id.* at 39-40.  Further, Ms. Newhart could not opine as to when the DNA was deposited.  *Id.* at 40.  Appellant thus argues the Commonwealth failed to prove that secondary transfer did not occur, and further provided no evidence of how the evidence was handled by police.  *Id.*  Appellant directs our attention to the lack of "chain-of-custody" testimony of record.  *Id.*  Appellant claims the trial

---

[14] Appellant preserved his weight claims in his post-sentence motion.

court abused its discretion by failing to assign appropriate weight to the lack of this evidence. *Id.* at 41.

In his sixth issue, Appellant argues his conviction of receiving stolen property is against the weight of the evidence. *Id.* Appellant again asserts the trial court should not have afforded more weight to Ms. Newhart's testimony "regarding the possibility of secondary transfer." *Id.* at 42. Appellant asserts,

> The record is clear that Officer Scott and Officer Auman touched the handgun with gloves, but the Commonwealth did not establish during the trial that the Officers changed their gloves after that interaction. They continued to collect evidence and transport the handgun along with items such as the stack of money found on [Appellant's] person. Therefore, it is equally as likely that a secondary transfer occurred[,] as the Commonwealth did not supply the [c]ourt with a detailed chain of custody and procedures taken by the Officers to prevent contamination ….

*Id.* at 43.

In his seventh issue, Appellant claims his conviction of firearms not to be carried without a license is against the weight of the evidence. *Id.* at 44. Appellant argues the trial court

> did not give proper weight to the fact the vehicle was not [Appellant's] and the location of the firearm, did not give proper weight to the DNA expert evidence regarding secondary transfer, and did not give enough weight to the evidence presented that [Appellant] was cooperative with police ….

*Id.* at 44. Appellant again claims he did not know about the gun's presence in the Buick. *Id.* Appellant contends the DNA sample does not definitively prove he handled the weapon. *Id.* at 45.

This Court has explained,

[a] new trial may be granted on the ground that the verdict is against the weight of the evidence only where the verdict was so contrary to the evidence that it shocks the trial court's sense of justice. Our review of the denial of a motion for a new trial based on weight of the evidence is limited. **We review whether the trial court abused its discretion in concluding that the verdict was not against the weight of the evidence, not whether the verdict, in this Court's opinion, was against the weight of the evidence.**

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge .... One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence.

*Commonwealth v. Weitzel*, 304 A.3d 1219, 1226-27 (Pa. Super. 2023)

(emphasis added; citations omitted).

> To determine whether a trial court's decision constituted a palpable abuse of discretion, an appellate court must examine the record and assess the weight of the evidence; not however, as the trial judge, to determine whether the preponderance of the evidence opposes the verdict, but rather to determine whether the court below in so finding plainly exceeded the limits of judicial discretion and invaded the exclusive domain of the [fact-finder]. Where the record adequately supports the trial court, the trial court has acted within the limits of its judicial discretion.

*Commonwealth v. Clay*, 64 A.3d 1049, 1056 (Pa. Super. 2013) (citation

omitted).

Here, the trial court rejected Appellant's weight challenges:

[A]s set forth above in this [c]ourt's analysis of the sufficiency of this evidence[,] this [c]ourt was presented with a case upon which to convict [Appellant]. This [c]ourt determined the credibility of the witnesses and, when assessing the weight of the evidence,

believed the evidence presented by the prosecution and rendered a guilty verdict. Therefore[,] the verdict was consistent with the evidence presented and did not shock anyone's sense of justice.

Trial Court Opinion, 10/17/23, at 11.

Contrary to Appellant's assertions, we are precluded from reweighing the evidence and substituting our judgment for that of the fact-finder. **Clay**, 64 A.3d at 1055. Discerning no abuse of the trial court's discretion, Appellant's challenges to the verdicts, as against the weight of the evidence, merit no relief. **See id.**; **see also** Trial Court Opinion, 10/17/23, at 11. Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/9/2024